TENNESSEE DEPARTMENT OF MEN-
TAL HEALTH AND MENTAL RETAR-
DATION, Plaintiff–Appellant,

v.

PAUL B. and The Hamilton County
Board of Education, Defendants–
Appellees.

No. 94–6040.

United States Court of Appeals,
Sixth Circuit.

Argued Jan. 23, 1996.

Decided July 12, 1996.

Rehearing and Suggestion for Rehearing
En Banc Denied Sept. 12, 1996.*

---

* Judge Batchelder would grant rehearing for the reasons stated in her dissent.

William B. Hubbard (argued and briefed), Weed, Hubbard, Berry & Doughty, Nashville, TN, for Tennessee Dept. of Mental Health and Mental Retardation.

Gary D. Buchanan (argued and briefed), Tennessee Protection & Advocacy, Inc., Nashville, TN, for Paul B.

Michael J. Mahn, Gary D. Lander (argued and briefed), Joseph A. SanFilippo, Jr., Chambliss & Bahner, Chattanooga, TN, for Hamilton County Bd. of Educ.

Before: CONTIE, NELSON, and BATCHELDER, Circuit Judges.

CONTIE, J., delivered the opinion of the court, in which NELSON, J., joined. BATCHELDER, J. (pp. 1479–1482), delivered a separate opinion concurring in part and dissenting in part.

CONTIE, Circuit Judge.

Plaintiff-appellant, Tennessee Department of Mental Health and Mental Retardation ("TDMHMR"), appeals the district court's grant of summary judgment to defendant-appellee, Paul B.,[1] and to defendant-appellee, the Hamilton County Board of Education ("HCBE"), in this action concerning the educational placement of a seriously emotionally disturbed child. For the following reasons, we reverse the grant of summary judgment and remand to the district court.

## I.

Paul B. was a 16–year–old, seriously emotionally disturbed child, who at the time of the litigation in this case had been hospitalized as a result of his disability on at least four occasions. His history of negative behavior included depression, stealing, running away, self-mutilation, and threats to kill family members. His first hospitalization occurred when he was in the sixth grade and his parents placed him in Valley Hospital, a private mental health facility in Chattanooga, Tennessee. He was hospitalized for seven weeks from March 18, 1988 until April 27, 1988, when he was transferred directly to the Moccasin Bend Mental Health Institute, a public facility operated by respondent TDMHMR. At Moccasin Bend, he was enrolled in the Smallwood School, a residential school housed on the grounds of the institute, where he remained from April 27, 1988 until November 7, 1988. At this time, Paul B. was not evaluated to determine whether he was seriously emotionally disturbed within the meaning of the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq.* (1995) ("IDEA" or "the Act") and was eligible for special educational services under the Act.

After Paul B. was discharged from Smallwood in November 1988, he lived at home and attended a private church school from which he was expelled shortly before his next psychiatric admission.

On November 20, 1989, Paul B. was again hospitalized at Moccasin Bend. This time he enrolled in the Pinebreeze School, a residential school on the grounds for adolescents, from November 20, 1989 until February 8, 1990. When Paul B. was to be discharged from Pinebreeze, the Hamilton County Schools were notified at the time of discharge and an evaluation was made of the child. As a result, Paul B. was determined to be seriously emotionally disturbed within the meaning of the IDEA and, thus, was eligible for free special education and related services. A multidisciplinary team ("M–Team") convened on February 8, 1990 to develop an Individualized Educational Program ("IEP") for Paul B. The M–Team determined that in order to meet his special educational needs, Paul B. required a structured day treatment program at Johnson Academy, a private school operated by the Joe Johnson Mental Health Center. Paul B.'s placement there was made by HCBE

---

1. Pursuant to an order of the district court, the student is referred to by a fictitious name.

through the M–Team process and was paid for by the county pursuant to the Act.

The M–Team decision of February 8, 1990 was recorded on a document entitled the "M–Team summary." On that same date, Paul B.'s father received a "Statement of Parental Rights." According to this statement, the signature of Paul B.'s father on the M–Team summary had the effect of placing his son in the special education program "as recommended."

Paul B. resided at home while attending Johnson Academy. On May 14, 1990, Paul B. was once again admitted to the residential psychiatric treatment program at Pinebreeze on an emergency basis. His father was unaware that residential psychiatric treatment was reimbursable under the Act as a related service if it was required to meet the child's special educational needs. In June 1990, Danny Gaddy of HCBE told him his son's residential psychiatric treatment program at Pinebreeze was possibly a related service covered under the IDEA. Gaddy arranged for an M–Team meeting to be convened on June 5, 1990. The IEP developed by the M–Team recommended educational placement at Pinebreeze retroactive to the date of the May admission. Because the M–Team determined Paul B. needed a residential psychiatric placement to meet his special educational needs, TDMHMR paid for Paul B.'s stay at Pinebreeze.

During the summer and fall of 1990, Paul B.'s father became concerned about what would happen to Paul B. when he was discharged from Pinebreeze, because his son had a long history of being discharged and then readmitted to psychiatric facilities. His family believed that this cycle would continue unless Paul B. was placed in a residential program after discharge from Pinebreeze. They believed he required a therapeutic program for the entire day, which could not be provided in the family home. In addition, they were concerned that they would not be safe with Paul B. in the family home.

For these reasons, his father asked Betty Henry, Paul B.'s Liaison Teacher–Counselor at Pinebreeze, to investigate community residential placements. Ms. Henry located a residential therapeutic group home, the Barton Avenue Group Home ("Barton Avenue"

or "the Home"), which was part of the Joe Johnson Mental Health Center, where Paul B. had formerly attended school at Johnson Academy in the day treatment program. She placed Paul B. on the waiting list for placement at the Home and took him on a tour of the facility.

In January 1991, the staff at Pinebreeze determined that Paul B. was ready to be discharged and informed his father that Paul B.'s psychotic symptoms were in remission, and he was no longer in danger of harming himself or others. The staff determined that he had completed the program at Pinebreeze and had progressed to the point at which he needed more interaction with the community. Paul B.'s father indicated to Betty Henry and to the Director of the Children and Youth Program at Pinebreeze that if Paul B. returned home, he and the child would probably have to leave due to the strained environment that resulted when Paul B. lived with the family.

On January 7, 1991, Paul B.'s M–Team reconvened to discuss his IEP after discharge from Pinebreeze. The team included Paul B.'s father, representatives of Pinebreeze School, which was run by TDMHMR, and representatives of HCBE. The records developed during the M–Team meeting indicate that several options were discussed, including the option of placing Paul B. in residential treatment at Barton Avenue. The record indicates that at one point in the discussion, the representatives of Pinebreeze School recommended placement at the Barton Avenue Group Home. Despite having discussed several options for Paul B.'s next educational placement, the M–Team's final decision was drafted as follows:

M–Team requests placement at Johnson Academy in the day treatment program. We believe that he will need up to once per week individual counseling with Dr. Long in order to benefit from his educational placement.

Paul B.'s father was present at the M–Team meeting and signed the M–Team summary, thereby indicating that he agreed with the M–Team's decision. In addition, he signed a separate portion of the IEP on which several of his legal rights as the parent of a handicapped child were listed, including

the right to request mediation and review or a Due Process Hearing if he disagreed with the decision of the M–Team. However, Paul B.'s father was not notified that if he wanted to appeal the M–Team's decision, Paul B. could remain at Pinebreeze School during the pendency of the appeal pursuant to the "stay put" provision of the IDEA, 20 U.S.C. § 1415(e)(3), which allows a child to stay in his "current educational placement" during judicial review of a parent's challenge to a proposed IEP that recommends a change in educational placement.

Although Pinebreeze representatives had recommended residential placement at Barton Avenue during the M–Team meeting, they did nothing further to get Paul B. into the Home. Paul B.'s grandfather contacted a person he knew on the Board and got Paul B. admitted. Paul B.'s father made independent arrangements to place his son at Barton Avenue after his release from Pinebreeze. Paul B. was placed at the Home on January 14, 1991, immediately after his discharge from Pinebreeze and seven days after the M–Team meeting. On January 18, 1991, Paul B.'s father entered into a unilateral fee-for-services contract with the Home in which he agreed to pay for the services provided to his son during his stay there. Barton Avenue billed Paul B.'s father for the cost of his son's stay.

In September 1991, Paul B.'s father requested a Due Process Hearing before an administrative law judge ("ALJ"), the purpose of which was to determine who was responsible for the cost of Paul B.'s stay at Barton Avenue. Petitioner Paul B. contended that respondents TDMHMR and HCBE should pay for his residential treatment there. Of the Barton Avenue bill, Paul B.'s family paid $4,500 and $20,208 remained due on the account.

After the Due Process Hearing, which was held on December 18, 1991, an ALJ concluded that TDMHMR was liable for all costs associated with the Barton Avenue Group Home placement. The ALJ based his conclusion on 34 C.F.R. § 300.401(a)(2), which provides that when a public agency recommends placement in a private facility, the placement is to be at "no cost to the parents." The ALJ reasoned that because TDMHMR had recommended placement at Barton Avenue during the M–Team meeting, but HCBE had not made such a recommendation, TDMHMR was solely responsible for the costs.[2]

In November 1991, Paul B. was discharged from Barton Avenue. After living at home for four or five days, he and his father moved and lived separately from the rest of the family. In early 1992, shortly after the decision of the ALJ, HCBE placed Paul B. at Grove School in Connecticut, a private, residential school for children with serious emotional problems, and paid all costs associated with this placement, including transportation.

TDMHMR appealed the ALJ's decision to a Tennessee state court. The case was subsequently removed to the United States District Court for the Middle District of Tennessee. Plaintiff TDMHMR contended that either defendant Paul B. or defendant HCBE was responsible for the cost of Paul B.'s placement at Barton Avenue. Each party filed a motion for summary judgment.

The district court granted Paul B.'s and HCBE's motions for summary judgment, agreeing with the ALJ that TDMHMR was solely liable for the costs of the Home, but affirmed for different reasons. The district court concluded that TDMHMR had merely recommended that Paul B. be placed at Barton Avenue. However, the final conclusion of the M–Team did not agree with this recommendation, and the IEP developed on January 7, 1991 stated that Paul B.'s educational placement required only a day treatment program at Johnson Academy with one-hour-

---

**2.** The ALJ also determined that TDMHMR was responsible for the cost of Paul B.'s admissions to Moccasin Bend Mental Health Institute from April 27, 1988 to November 7, 1988, and from November 20, 1989 until February 8, 1990, because TDMHMR should have evaluated Paul B. upon these admissions to determine if he was seriously emotionally disturbed within the meaning of the Act and, therefore, eligible for special educational services, including residential psychiatric treatment. The ALJ found that because TDMHMR is a state agency to which the provisions of the Act apply, it violated the IDEA by its failure to evaluate Paul B. Therefore, it was required to pay for these admissions even though they occurred before his evaluation by an M–Team. This portion of the ALJ's decision is not at issue in this appeal.

per-week of individual counseling and did not provide for residential psychiatric treatment. The district court found that one was not entitled to reimbursement for residential placement in a private group home on the basis of a mere recommendation at an M–Team meeting, when residential placement was not the final recommendation of the M–Team. However, the district court concluded that TDMHMR was liable for the costs of Paul B.'s residential placement at Barton Avenue, because the Department failed to inform Paul B.'s father that he could maintain Paul B.'s current educational placement in the residential psychiatric program at Pinebreeze if he wished to appeal the M–Team's decision to change Paul B.'s IEP by placing him in a day treatment program at Johnson Academy without a residential component.

TDMHMR now appeals the judgment of the district court pursuant to 20 U.S.C. § 1415(e)(2), which grants federal courts jurisdiction over appeals under the Act.

## II.

This case arises under the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq.* (1995). Under the Act, a student who is eligible for special education because of a disability is to be provided a "free appropriate public education" consisting of special education and related services. 20 U.S.C. § 1401(a)(18). An M–Team is a group of individuals, including educators and medical professionals with knowledge of a child's condition, who are required to develop an Individualized Educational Program or IEP for every disabled child, specifying the necessary special education and related services which the child needs in order to receive a free appropriate public education. 34 C.F.R. §§ 300.340–350. Once an IEP has been developed for a disabled child, the state educational agency must provide the special education and related services necessary to implement the IEP and to provide, thereby, a free appropriate public education to the disabled child at no cost to the child's parents. *See* 34 C.F.R. § 300.401.

■ The IDEA creates a statutory preference and expressly mandates that handicapped or disabled children be educated in the least restrictive environment to the maximum extent appropriate. 20 U.S.C. § 1412(5)(B); 34 C.F.R. §§ 300.550–556. Notwithstanding the IDEA's mandate that students be placed in the least restrictive environment, the IDEA does provide for residential placement if such a placement is necessary to meet the child's individual educational needs. *See* 20 U.S.C. §§ 1401(a)(16)(A), 1413(a)(4)(B); 34 C.F.R. §§ 300.302 and 300.551.

The controlling regulation provides:

> If placement in a public or private residential program is necessary to provide special education and related services to a child with a disability, the program, including non-medical care and room and board, must be at no cost to the parents of the child.

34 C.F.R. § 300.302. To assess whether a residential placement is appropriate, a determination must be made whether full time residential placement is necessary for educational purposes as opposed to medical, social, or emotional problems that are separable from the learning process. *McKenzie v. Smith,* 771 F.2d 1527, 1534 (D.C.Cir.1985); *Kruelle v. New Castle County School Dist.,* 642 F.2d 687, 693 (3d Cir.1981). Under the Act, residential placement is "at no cost to the parents of the child" only if it is necessary for educational purposes.

■ The development and implementation of the IEP are the cornerstones of the Act. *Honig v. Doe,* 484 U.S. 305, 311, 108 S.Ct. 592, 597–98, 98 L.Ed.2d 686 (1988). The IEP is the written statement which sets out an educational program to meet the particularized needs of a child with disabilities. 20 U.S.C. § 1401(a)(20). An M–Team may convene and change a child's IEP, but the Act provides procedural protections to the parents of the child when this occurs. Under the federal regulations, prior written notice to the parent or guardian of a handicapped child is required whenever the M–Team proposes to initiate or change, or refuses to initiate or change, the identification, evaluation, or educational placement of the child. 34 C.F.R. § 300.504(a). The notification must include a full explanation of the procedural safeguards available to the parents, a

description of the action proposed or refused, an explanation of why the action was proposed or refused, a description of any options the school considered and why those options were rejected, a description of the evaluation procedures used to form the basis of the proposal or the refusal, and a description of other relevant factors. 34 C.F.R. § 300.505(a); *Doe v. Alabama State Dept. Educ.*, 915 F.2d 651, 655 (11th Cir.1990).

 Under § 1415(e)(3) of the Act, there is a "stay put" provision, which commands that during the pendency of any proceedings to challenge a change in a child's IEP, the child shall remain in the current educational placement unless the school authorities and parents agree otherwise. In other words, if the parents disagree with the new IEP developed by the M–Team, the child may "stay put" in his current educational placement while the decision is appealed. The "stay put" provision is premised on the rationale that preservation of the status quo, rather than an inappropriate reaction to an emergent situation, provides for the best interests of the child. The "stay put" provision insures that a school cannot eject a child and change his placement without complying with due process requirements. *Tokarcik v. Forest Hills School Dist.*, 665 F.2d 443, 453 (3rd Cir.1981), *cert. denied*, 458 U.S. 1121, 102 S.Ct. 3508, 73 L.Ed.2d 1383 (1982). It also guarantees consistency in a child's learning environment until a challenge to an existing placement or a new placement has successfully established whether a different alternative placement is necessary. As the Supreme Court stated in *Honig v. Doe*, 484 U.S. at 323, 108 S.Ct. at 604, the "stay put" rule was intended to protect children from unilateral displacement by school authorities or by an M–Team. One of the evils Congress sought to remedy was a unilateral exclusion of disabled children by schools, *id.*, and one of the purposes of § 1415(e)(3) is "to prevent school officials from removing a child from the ... classroom over the parents' objection, pending completion of the review proceedings." *Andersen by Andersen v. District of Columbia*, 877 F.2d 1018, 1023 (D.C.Cir.1989).

### III.

In the present case, the district court concluded that TDMHMR had failed to give Paul B.'s father notice of the "stay put" rule, and therefore was required to pay for Paul B.'s residential placement at Barton Avenue. He concluded that TDMHMR was liable for the costs, even though the M–Team had not finally recommended placement at Barton Avenue after determining that 24–hour–per–day residential placement was no longer necessary to meet the special educational needs of Paul B. The district court assumed that if Paul B.'s father had known of the "stay put" rule, he would have left his son in his current residential program at Pinebreeze, while he appealed the M–Team's decision to change Paul B.'s educational placement to a day treatment program at Johnson Academy without a residential psychiatric component. Based on this assumption, the district court granted Paul B.'s motion for summary judgment, because it was undisputed that his father had not been informed of the "stay put" provision of the IDEA.

 We review a district court's award of summary judgment de novo. *City Management Corp. v. U.S. Chemical Co.*, 43 F.3d 244, 250 (6th Cir.1994). In reviewing summary judgment motions, this court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943–44 (6th Cir.1990). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Under the IDEA, in order to review a decision of the ALJ, the district court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate. 20 U.S.C. § 1415(e)(2).

## IV.

■ We believe the district court erred in determining that the failure to inform Paul B.'s father of the "stay put" rule was the material fact which determined the outcome of this case. We find that an alleged violation of the "stay put" rule is not dispositive in the present case, which instead depends for its resolution on a factual determination of what occurred at the M–Team meeting of January 7, 1991 to assess whether other procedural guarantees of the Act were violated. Because there are contested issues of material fact regarding these alleged procedural violations, we believe a grant of summary judgment to Paul B. and HCBE is precluded at this stage of the proceedings. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 249, 106 S.Ct. at 2510–11.

We will first discuss why the district court erred in focusing on the alleged violation of the "stay put" rule.[3] The district court reasoned that if Paul B.'s father had chosen to appeal the M–Team's recommendation for educational placement in the day treatment program at Johnson Academy, which did not include payment for residential psychiatric services at the Barton Avenue Group Home, Paul B. could have remained in his current residential placement at Pinebreeze, which would have been paid for during the pendency of the appeal. Therefore, equity required TDMHMR to pay the cost of residential treatment at Barton Avenue. The district court's decision was based on the assumption that Paul B.'s father understood the M–Team decision, disagreed with it, and would have appealed it had he known of the "stay put" rule.

We believe that the reasoning of the district court is flawed for the following reasons. The district court's assumption that Paul B.'s father would have requested review if he had been informed of the "stay put" rule does not find factual support in the record. Before the ALJ, Paul B.'s father did not argue that the M–Team decision was wrong; he argued that he misunderstood it. He argued that he believed the M–Team had recommended another residential placement at Barton Avenue. Therefore, he had no reason to contest Paul B.'s discharge from his current residential placement at Pinebreeze. It was only after the fact that Paul B.'s father insisted in an affidavit before the district court that he would have challenged the M–Team decision had he known of the "stay put" rule.

■ In order for Paul B. to have had the right to remain in his current educational placement at Pinebreeze under the "stay put" provision of the Act, Paul B.'s father would have had to argue that his son required 24–hour–a–day, seven-day-a-week residential treatment to meet his special educational needs. However, no such argument was made. The ALJ and district court failed to see that to invoke the "stay put" provision of the Act, Paul B.'s father had to contend that the M–Team's recommended IEP was inappropriate and that a residential psychiatric program was necessary in order for Paul B. to benefit from the special education and related services guaranteed him under the IDEA. As this court stated in *Cordrey v. Euckert*, 917 F.2d 1460, 1468 (6th Cir.1990), *cert. denied*, 499 U.S. 938, 111 S.Ct. 1391, 113 L.Ed.2d 447 (1991), the "stay put" provision does not appear to be one of the Act's procedural requirements which attempts to insure adequate individualized educational programs and whose violation would constitute denial of a free appropriate public education under the Act. Rather, the "stay put" provision is activated only when a parent alleges that there has been a substantive violation of the Act and has initiated administrative and judicial review to challenge the M–Team's decision.

■ In *School Committee of the Town of Burlington, Mass. v. Mass. Dept. Educ.*, 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985), the Supreme Court found that a parent who rejected the child's proposed IEP

---

3. The difficulty with this case is that appellant TDMHMR is contesting on appeal the district court's decision about who should pay for Paul B.'s placement at Barton Avenue, implicitly accepting the district court's conclusion that the "stay put" rule was violated and that either TDMHMR or HCBE should pay for this violation. TDMHMR contends on appeal that appellee HCBE is responsible for the costs. However, this is not what TDMHMR argued before the district court.

placement and unilaterally placed the child in a state-approved private school could be reimbursed for that placement under 20 U.S.C. § 1415(e)(2), because the parent pursued administrative due process remedies for the private school placement, and the courts later determined that the private school placement was warranted under the Act. *Id.* at 369–74, 105 S.Ct. at 2002. In contrast, in the present case, Paul B.'s father did not reject the proposed IEP and claim that his son was denied a free appropriate public education because he was incorrectly discharged from residential treatment at Pinebreeze and placed in a day treatment program at Johnson Academy. *See Babb v. Knox County School System,* 965 F.2d 104, 108 (6th Cir.) (because parents showed school district failed to create an IEP sufficient to meet child's specialized needs, reimbursement to parents for expenses incurred in placing child in private residential program was warranted), *cert. denied,* 506 U.S. 941, 113 S.Ct. 380, 121 L.Ed.2d 290 (1992). Paul B. has not asked the ALJ, the district court, or this court to determine whether private residential placement at the group home at Barton Avenue was warranted under the Act, as was the case in *Burlington.* Although on appeal, Paul B.'s father argues that like the parent in *Burlington,* he was forced to make a unilateral placement, he has not claimed that his son's special educational needs would not have been met without placement at Barton Avenue. As the court in *Lunceford v. D.C. Board of Educ.,* 745 F.2d 1577, 1582 (D.C.Cir.1984) stated, one must identify a detrimental change in the elements of an educational program in order for a chance to qualify for the "stay put" provision. Paul B. has not identified such a detrimental change within the meaning of the Act. The purpose of the Act is not to provide free residential psychiatric treatment for a seriously emotionally disturbed child, but to provide for his special educational needs.

We believe the district court erred because it failed to see that the "stay put" rule is not designed to prolong "the current educational placement" unless there is a genuine appealable issue that "the current educational placement" is the appropriate placement under the Act and should not be changed. To appeal a decision, which one otherwise has not disputed, in order to keep a child in a residential psychiatric program and avoid family conflict undermines the purposes of the "stay put" provision of the Act. In the present case, Paul B. made no argument that Pinebreeze was the appropriate placement and should not have been changed or that the special services guaranteed him under the Act were denied him because the M–Team determined he no longer needed related residential psychiatric services as part of his IEP.[4] Without such an argument, the "stay put" provision of the Act does not come into play, and Paul B. cannot show how he was harmed by his lack of notice of the "stay put" rule.

We find that lack of notice of the "stay put" rule warrants an equitable remedy only if there is a colorable appealable claim that the child was denied a free appropriate public education under the Act. Because no such claim has been made in the present case, the district court erred in relying on TDMHMR's failure to give notice of the "stay put" rule in finding that TDMHMR was responsible for paying the costs of Paul B.'s placement at the Barton Avenue Group Home. Paul B.'s father did not allege facts that he had grounds for challenging the M–Team decision based on his son's educational needs, a challenge which is necessary before the "stay put" rule can be invoked.[5] For this reason, the decision of the district court to grant summary judgment to Paul B. and to HCBE because of lack of notice of the "stay put" rule is hereby reversed.

---

4. Paul B.'s father's contention that Paul B. received a well-defined therapeutic program at Barton Avenue based on documented goals and objectives, and that these goals and objectives addressed his behavior and his daily living skills, which were directly linked to his academic instruction at Johnson Academy, is not sufficient to state such a claim.

5. Instead, he argued that the M–Team mislead him into agreeing to the change in placement by failing to notify him that the residential psychiatric component was being dropped from Paul B.'s IEP, and he reasonably believed that his son's residential care at the Barton Avenue Group Home would be paid for.

## V.

Instead, we believe this case must be remanded to the district court. Although the alleged violation of the "stay put" rule is not dispositive, Paul B. also alleged other violations of the notice requirements of the Act in connection with the M–Team meeting of January 7, 1991. Whether Paul B. is entitled to relief or not depends on whether these other allegations are found to be true as a factual matter.

There are two versions of what occurred at the M–Team meeting. Paul B.'s father argued that he reasonably believed that the IEP developed on January 7, 1991 included placement in the group home at Barton Avenue as the residential psychiatric component of his son's educational placement plan. He contended that at the meeting a document entitled "M–Team Summary" was produced. The document included the following statements: (1) "Pinebreeze staff does recommend Johnson Academy *and the group home*" (emphasis added); (2) "Once Paul B. enters Barton Avenue Group Home, the group home will provide transportation"; and (3) "anticipated date of entry into Barton Avenue Group Home is 1–18–91." Paul B.'s father argued that the written M–Team document provided no indication that his request for Paul B.'s residential placement at Barton Avenue was refused, when the document itself states that the placement is recommended, sets a date for Paul B.'s entry into the program, and describes the transportation arrangements that were made.

Paul B.'s father also argued that according to a statement of parental rights he received after a prior M–Team meeting on February 8, 1990, he believed his signature on the M–Team summary had the effect of placing his son in a special residential educational program at the Joe Johnson Mental Health Center, including the Barton Avenue Group Home and Johnson Academy "as recommended." He argued that the official M–Team documents reflected that the Pinebreeze staff recommended a residential placement in a group home and that the arrangements for this placement at Barton Avenue were finalized at the M–Team meeting.

Paul B.'s father conceded that the statements in the M–Team summary about Barton Avenue appear in a section headed "Discussion," and a separate section headed "Decision" does not mention Barton Avenue, but states that the M–Team requests placement at Johnson Academy in the day treatment program. Paul B.'s father argued that no one at the meeting told him that this meant he would have to pay for his son's residential placement at Barton Avenue, or that the M–Team was recommending that Paul B. no longer needed residential psychiatric treatment in order to meet his special educational needs, but only needed a day treatment program at Johnson Academy. Paul B.'s father contended that he reasonably believed that the recommendations for Johnson Academy and the Barton Avenue Group Home, which were both part of the Joe Johnson Mental Health Center, were complementary, and both would be paid for by the state or county under the provisions of the IDEA.

TDMHMR and HCBE contested this version of the facts before the ALJ and the district court. They argued that it is clear from the record that on January 7, 1991, the MTeam decided that Paul B. no longer required residential psychiatric treatment in order to meet his special educational needs, which instead could be met by his new educational placement in the day treatment program at Johnson Academy. They argued that the decision portion of the M–Team summary clearly indicated that the child needed a highly structured individualized day treatment program along with outside counseling once a week with Dr. Long. They contended that although the discussion section of the M–Team summary stated that Pinebreeze staff "does recommend Johnson Academy and the group home," the discussion also stated that the M–Team "only can address educational placement and not place in the group home." They argued that Paul B.'s father unilaterally arranged for a residential placement at Barton Avenue for noneducational reasons, and that the record shows that Paul B.'s father began the arrangements for such a placement before the M–Team meeting convened.

TDMHMR and HCBE relied on the testimony of Danny Gaddy, the case coordinator for HCBE, who testified as follows:

Q. Did the M–Team of January 7, 1991, ever decide that a residential treatment facility was necessary for the educational purposes for [Paul B.]?

A. No, there were people from the mental health system in attendance at the M–Team. My understanding was that [Paul B.] was ready to be discharged from Pinebreeze and that for personal reasons, his family felt like he should not come home.

I explained that all an M–Team can do is to make educational decisions, and I believe I wrote it into the discussion that I specifically noted that we could not make decisions related to Barton Avenue. That's a mental group home, and is not a question of educational placement.

Q. So to achieve the education goals in the IEP, was it necessary for there to be residential placement to accomplish that education?

A. No.

TDMHMR and HCBE also relied on the following evidence in support of their argument. They pointed out that the M–Team expressed its final decision in the M–Team summary as follows:

M–Team requests placement at Johnson Academy in the day treatment program. We believe that he will need up to once per week individual counseling with Dr. Long in order to benefit from his education.

They argued that Paul B.'s father expressed agreement in this final decision and signed the M–Team summary. They argued that he knew, or reasonably should have known, that this was the final decision, because not only was it memorialized in the M–Team summary, but also it was written into the IEP in the block describing the services and providers as follows: "academics and day treatment at Johnson Academy. A 32.5 hour school week is also specified." Thus, there was no indication in the M–Team summary that payment for a residential psychiatric placement at Barton Avenue was part of Paul B.'s IEP. TDMHMR and HCBE argued that although

residential placement was discussed at the M–Team meeting, Paul B.'s father was told that it was no longer required as part of the special educational services guaranteed his son under the Act. According to respondents, Paul B.'s father was, thus, verbally given notice that the family, not TDMHMR or HCBE, would have to pay for Barton Avenue. They argued that it was clear from the M–Team discussion that the Barton Avenue Group Home was not part of Paul B.'s educational placement and would not be paid for as a related service pursuant to the provisions of the IDEA.

TDMHMR and HCBE also contended that the record indicates Paul B.'s father unilaterally placed Paul B. at Barton Avenue, aware of his responsibility for payment, because the placement was completely unrelated to any prior negotiation between them and the Home as part of his son's IEP. For this argument, they relied on the testimony of Don Fontana, who was the CEO at the Joe Johnson Mental Health Center. He testified before the ALJ as follows:

I simply did a favor for a friend of mine who had a grandson that was having difficulty. The family was having difficulty, and he asked me if I could help out, and I said sure.

And that's how [Paul B.] got placed in the Barton Avenue Group Home. It was not done by any other referral from the school or from the Board of Education or from the Pinebreeze staff. It was just—I did it personally.

TDMHMR and HCBE argued that although the Pinebreeze staff had located and recommended Barton Avenue as an appropriate residence for Paul B. due to his family circumstances, it was clear that this was done for social or emotional reasons, not for educational reasons, which alone would require reimbursement under the Act.

Moreover, the affidavit of Betty Jo Henry, the Liaison Teacher–Counselor at Pinebreeze, stated that she recommended that Paul B. be residentially placed at Barton Avenue due to his family circumstances and the strained environment that resulted when the child returned home and did not make

this recommendation as a necessary part of his educational placement. Gary Stoegbauer, the Director of Children and Youth Programs at Pinebreeze, swore in his affidavit that in December 1990, the staff at Pinebreeze determined that Paul B. needed more interaction with the community and that he should be discharged. He stated:

It was my understanding from conversations with the father of Paul B. that returning the child to his home was not a good option, not because of the child's educational needs, but because of his family situation.

. . . .

Since the child needed to be discharged from Pinebreeze and could not go home, the Pinebreeze staff tried to assist the parents in finding a suitable facility in which the child could reside.

. . . .

Pursuant to the parents' request and prior to the January 7, 1991, M–Team meeting, the Pinebreeze staff arranged to have Paul B. placed on the waiting list for Barton Avenue Group Home.

After the M–Team meeting of January 7, 1991, it is my understanding that the Pinebreeze staff did not take any steps to place the child in the Barton Avenue Group Home.

Also, Mr. Gaddy of HCBE testified before the ALJ as follows:

My understanding is that his wife said that [Paul B.] could not come home, and he at the time indicated that he felt like it would be the kind of situation that he's in now, that he would have to leave the home with [Paul B.], and that's a home problem. That's not an educational problem.

. . . .

There was [sic] essentially two meetings going on at once. One was an M–Team, and the other was negotiations between [Paul B.'s father] and the mental health people as to where his son, who was now ready to be discharged from the hospital, was going to be living.

And in order to clarify the issue and in order to delineate responsibility, I wrote in there that I cannot be—or the M–Team

cannot address where he's going to live, because [his father] felt like he could not accept him at home. That's not an educational question.

Based on this testimony, TDMHMR and HCBE argued it is clear from the record that Paul B.'s father decided to unilaterally place his son in the Home even though it was not part of his IEP.

It is uncontested that on January 14, 1991, Paul B.'s father placed Paul B. in the Home, and four days later entered into a fee-for-services contract in which he agreed to pay for the services provided to his son, including fees for room and board. However, Paul B.'s father argued that he did so under duress. He contended that when he was unexpectedly asked to sign a contract to pay for the placement, he had no choice because Paul B. had already been discharged from Pinebreeze, and there was no place for him to go other than the family home, which was neither appropriate, nor safe.

We find that these contested facts concerning the M–Team meeting of January 7, 1991, indicate either: (1) Paul B.'s father reasonably believed from the discussion that his son's placement at Barton Avenue was part of his IEP and was a service that would be paid for under the Act; or (2) Paul B.'s father was reasonably informed of the decision to drop residential psychiatric treatment from his son's IEP and unilaterally placed his son at Barton Avenue. The evidence indicates that there were two discussions going on at the M–Team meeting—one between Paul B.'s father and the Pinebreeze staff about where his son should reside, and one concerning his educational needs. Whether Paul B.'s father reasonably believed that the discussion with the Pinebreeze staff concerning placement at Barton Avenue was a recommendation that was included in his son's IEP and would be paid for under the Act is a contested issue of material fact. The Act provides procedural protections to the parents of a handicapped child in the form of adequate notice about a change in an IEP, and these protections were allegedly violated by the ambiguous statements made at the M–Team meeting.

The facts Paul B.'s father described before the ALJ are consistent with his argument that he was not properly notified about the M–Team's decision. Paul B.'s father argued that he did not receive a proper description of the proposed action and that he had such a right under 34 C.F.R. §§ 300.504–505 to written notice, including "a description of the action proposed or refused by the agency." He argued that the M–Team's summary did not provide him with a clear description of the agency action to drop the residential component from his son's IEP, because the document itself stated that residential placement at the group home was recommended, set a date for his son's entry into the Home, and described transportation arrangements. Paul B.'s father contended that he was not given proper notice that his request for payment for his son's residential treatment at Barton Avenue was refused by the M–Team, when the written document stated the opposite.

■ We believe these allegations create a dispositive issue, which the district court must address on remand. Contrary to the dissent's contention, we believe it does matter what Paul B.'s father deduced from the discussion with Pinebreeze staff at the M–Team meeting of January 7, 1991. Under 34 C.F.R. §§ 300.504–505, a clear description of the action proposed or refused by the agency should have been given to Paul B.'s father. Whether or not this procedural requirement was fulfilled is contested. If the notice provisions of the Act were violated as alleged and Paul B.'s father was mislead as a consequence, we believe Paul B.'s placement at Barton Avenue Group Home is reimbursable as an equitable remedy under § 1415(e)(2) of the Act, because the alleged lack of notice prevented Paul B.'s father from effectively participating in the IEP process. As the court in *Doe v. Alabama State Dept. of Educ.*, 915 F.2d at 660, stated, "It is beyond dispute that full parental involvement in the handicapped child's education is the purpose of many of the EHA's procedural requirements," and a procedural violation causing harm warrants equitable relief. *Id.* at 661–62.

We agree. The Supreme Court has noted:

When the elaborate and highly specific procedural safeguards embodied in § 1415 [setting out the requirements of written notice to parents or guardian, due process hearing, and administrative and judicial review] are contrasted with the general and somewhat imprecise substantive admonitions contained in the Act, we think that *the importance Congress attached to these procedural safeguards cannot be gainsaid.* It seems to us no exaggeration to say the Congress placed every bit as much emphasis upon compliance with procedures giving parents and guardians a large measure of participation at every stage of the administrative process as it did upon the measurement of the resulting IEP against a substantive standard. We think that the congressional emphasis upon full participation of concerned parties throughout the development of the IEP, as well as the requirements that state and local plans be submitted to the Secretary for approval, demonstrates the legislative conviction that adequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP.

*Bd. of Educ. v. Rowley,* 458 U.S. 176, 205–06, 102 S.Ct. 3034, 3050–51, 73 L.Ed.2d 690 (1982) (emphasis added). As the *Doe* court pointed out, the Supreme Court in this passage recognized both the importance of the Act's procedural requirements, and the purpose of those requirements: "full participation of concerned parties throughout the development of the IEP." 915 F.2d at 662.

In the present case, we believe that if Paul B.'s alleged notice deficiencies are taken as true (which must be done on a motion for summary judgment), then these deficiencies had a harmful impact on Paul B.'s father's full and effective participation in the IEP process. If Paul B.'s father reasonably believed that a residential psychiatric component was still part of his son's IEP, he had no reason to protest a change in the IEP and was harmed by his reliance on the allegedly ambiguous statements made at the M–Team meeting. He contended he agreed to the removal of his son from his current residen-

tial psychiatric placement at Pinebreeze because he believed Paul B.'s residential placement at Barton Avenue would be paid for. If this is true, Paul B.'s father was not given an opportunity to challenge the M–Team decision due to lack of proper notification. We believe the dispositive issue in the present case is not whether Paul B.'s educational needs required residential psychiatric placement, but whether Paul B.'s father's procedural rights to adequate notice were violated, preventing him from full and active participation in the IEP process.

Contrary to the dissent's contention that this case can be decided on summary judgment because no provision of the IDEA allows for reimbursement, courts have found equitable relief warranted under § 1415(e)(2) of the Act in similar circumstances. For example, the court in *Hall by Hall v. Vance County Bd. of Educ.*, 774 F.2d 629, 634–35 (4th Cir.1985) found that several procedural errors, which caused harm, including the school district's failure to inform parents of their rights or to prepare a sufficiently specific IEP, were enough "by themselves" to warrant reimbursement for unilateral placement. *See also Tice v. Botetourt County School Bd.*, 908 F.2d 1200, 1208–09 (4th Cir. 1990) (court granted relief of reimbursement of the parents' expenses for alternative unilateral placement for the period of time that the procedural violation caused delay in establishing an appropriate IEP); *Evans v. District No. 17 of Douglas County, Neb.*, 841 F.2d 824, 828 (8th Cir.1988) (in a proper case, monetary relief can be awarded for procedural violations); *Jackson v. Franklin County School Bd.*, 806 F.2d 623, 629 (5th Cir.1986) (although the appropriateness of the IEP was not contested, informal procedures that did not adhere to requirements of the Act and failed to provide proper notice warranted equitable relief).

Although Paul B.'s father may have been harmed by lack of notice because the statements made at the M–Team meeting were ambiguous and allegedly failed to provide him with a clear indication of the M–Team's decision to drop a residential psychiatric component from his son's IEP, this court cannot make a determination in this regard, because there are contested issues of material fact which preclude summary judgment at this stage in the proceedings. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324–27, 106 S.Ct. 2548, 2553–55, 91 L.Ed.2d 265 (1986). TDMHMR and HCBE argue that contrary to Paul B.'s contentions, the facts indicate his father understood that the Barton Avenue placement was not part of Paul B.'s IEP, and he unilaterally placed his son at the group home there, because he was afraid to have Paul B. reside with the family, and then, after the fact, tried to get the state to pay for the placement. We believe a decision on the merits cannot be rendered without resolving this factual dispute. For this reason, we must remand the case to the district court.

## VI.

To conclude, we find the district court erred in deciding this case under the "stay put" rule instead of the other notice provisions of the IDEA that were arguably violated by the statements made at the M–Team meeting of January 7, 1991. We, therefore, **REVERSE** the district court's grants of summary judgment to defendants Paul B. and HCBE on the basis of lack of notice of the "stay put" rule. The district court's decision is hereby **VACATED**, and the case is **REMANDED** to the district court for proceedings consistent with this opinion.

BATCHELDER, Circuit Judge, concurring in part and dissenting in part.

Although I agree with the majority that the district court erred in holding the Tennessee Department of Mental Health and Mental Retardation ("TDMHMR") responsible for payment of Paul B.'s residential home expenses, I do not agree with the ultimate disposition of this appeal. Accordingly, I concur in part and dissent in part.

## I. FACTS AND PROCEDURAL HISTORY

Defendant-appellee Paul B. is an emotionally disturbed child within the meaning of the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq.* (1990 & Supp.1996)

("IDEA").[1] During the 1980s, he was in and out of several institutions for emotionally disturbed children. A "multidisciplinary team," or "M–Team," placed him at Pinebreeze School, a residential institution which plaintiff TDMHMR operates, on June 5, 1990.

An M–Team which included Paul B.'s father, representatives of Pinebreeze, and representatives from defendant Hamilton County Board of Education ("Board") met on January 7, 1991. Although the parties' accounts of this meeting vary, we have two documents which are helpful: the "individualized education program" ("IEP") and the "M–Team summary." Both are dated January 7, 1991, and signed by M–Team members.

Under the IEP, Paul B. was to meet with his case coordinator for 50 minutes twice per month, have an academic program for 3 hours and 50 minutes five times per week, have day treatment for three hours five times per week, have individual counseling with the Johnson Academy staff once a week for one hour and additional individual counseling with Dr. Long for one hour per week. The IEP reflects the M–Team's belief that Paul B. needed a day-treatment program, outside counseling once per week, and a high level of support and structure.

The M–Team summary, in a section entitled "Decision," states, "M–Team requests placement at Johnson Academy in the Day Treatment program. We believe that he will need up to once per week individual counseling...." A section entitled "Continued Discussion" states, *inter alia,*

(7) We discussed that [Paul B.] may be able to continue at Pine Breeze in the evening transition to [Johnson Academy] or he may enter the group home now [illegible] there is an opening (8) We discussed that the M Team only can address educational placement & not place in the group home ... (10) Pine Breeze staff

does recommend Johnson Academy & the group home ... (12) We discussed a week transition from Pine Breeze to [Johnson Academy] w/ parent providing transportation (13) Once [Paul B.] enters Barton Ave. Group Home—the group home will provide transportation.... (16) [Johnson Academy] is willing for [Paul B.] to begin at [Johnson Academy] on 1/14/91—Parent to transport & will deliver academic information (17) Anticipated entry into Barton Ave. group Home is 1/18/91.

Later in January 1991, Paul B.'s father took Paul B. to the Barton Avenue Group Home and signed a contract agreeing to pay for the placement. The father claims he signed this contract under duress, because his son had been discharged from Pinebreeze and the family had "no place else for him to go, other than the family home which was neither appropriate or safe."

The father later requested a due process hearing to decide who should pay the bill from the Barton Avenue Group Home. The state administrative-law judge ("ALJ") ordered the TDMHMR to pay, because the Pinebreeze staff had recommended that Paul B. be in Barton Avenue. Citing 34 C.F.R. § 300.401(a)(2),[2] the ALJ held that when a public agency recommends placement in a private facility, placement is at no cost to parents. The district court agreed with the ALJ's conclusion but disagreed with his reasoning. Without citing case law, the district court held that the TDMHMR should pay, not because the Pinebreeze staff had recommended Paul B. be at Barton Avenue, but because the TDMHMR had not advised Paul B's father of the stay-put rule, found in 20 U.S.C. § 1415(e)(3) (Supp.1996) and 34 C.F.R. § 300.513(a) (1995). Accordingly, the district court granted the defendants', and denied the plaintiff's, summary-judgment motions. The plaintiff appeals.

---

1. The statute, now called "the Individuals with Disabilities Education Act," 20 U.S.C. § 1400(a) (Supp.1996), was formerly called "the Education of the Handicapped Act." 20 U.S.C. § 1400(a) (1990).

2. "Each [state educational agency] shall ensure that a child with a disability who is placed in or referred to a private school or facility by a public agency [i]s provided with special education services [a]t no cost to parents[.]" 34 C.F.R. § 300.401(a)(2) (1995) (citing 20 U.S.C. § 1413(a)(4)(B)).

## II. DISCUSSION

After a lengthy discussion of underlying facts and procedural history, *ante* at 1468–1471, 1472, the court today reverses and vacates the district court's ruling on summary judgment. *Ante* at 1479. The court holds, and I agree, that the district court erred in even considering the stay-put rule, because Paul B. did not contend[3] that a residential program was necessary for him to benefit from the special education and related services which the IDEA guarantees him. *Ante* at 1473–1474; *cf. Thomas v. Cincinnati Board of Educ.*, 918 F.2d 618, 625 (6th Cir.1990) (when the only procedural error is technical noncompliance which caused no substantive deprivation, there is no prejudicial error).[4]

However, the court then finds, following an extended review of the parties' positions, *ante* at 1475–1477, that either (1) Paul B.'s father reasonably believed placement at Barton Avenue was part of the IEP and would be paid for under the IDEA, or (2) he was reasonably informed that residential psychiatric treatment was not in the IEP, and he unilaterally placed his son at Barton Avenue. The court then holds that there is a genuine issue of material fact about whether Paul B.'s father reasonably believed the discussion with the Pinebreeze staff about placement at the Barton Avenue Group Home was in his son's IEP. *Ante* at 1477–1478.

From this latter holding I respectfully dissent. As the majority opinion points out, neither Paul B. nor his father contends that a residential program was necessary for Paul B. to benefit from the special education and related services to which he is entitled under the IDEA, *ante* at 1473–1474, and there is no evidence in the record to support such a contention if it were made. The obligation of an agency of the state to pay for a residential program is dependent upon the necessity of the program in order for the disabled child to benefit from the services agreed upon in the IEP. *See* 34 C.F.R. § 300.302 (1995) (citing 20 U.S.C. §§ 1412(2)(B), 1413(a)(4)(B)). Absent such evidence, it does not matter what Paul B.'s father deduced from the discussion with the Pinebreeze staff. There may be a dispute about what he believed, but it is not a genuine issue of *material* fact under FED. R. CIV. P. 56(c).[5]

There is no other provision of the IDEA which requires the TDMHMR or the Board to pay the Barton Avenue Group Home bill under the circumstances before us. I would reverse and vacate the district court's order and remand this action with instructions to

---

**3.** A mere contention, of course, would not suffice on a motion for summary judgment. *See* FED. R. CIV. P. 56(c).

**4.** We need not consider whether the Barton Avenue Group Home was Paul B.'s "then current educational placement" under the stay-put rule, *see generally Thomas*, 918 F.2d at 625–26, or whether placement in the Barton Avenue Group Home was included in the IEP. *See generally Cordrey v. Euckert*, 917 F.2d 1460, 1468 (6th Cir.1990) (citing *Gregory K. v. Longview School Dist.*, 811 F.2d 1307, 1314 (9th Cir.1987)), *cert. denied*, 499 U.S. 938, 111 S.Ct. 1391, 113 L.Ed.2d 447 (1991).

**5.** I also observe that the district court did not consider whether the Barton Avenue Group Home was an appropriate placement for Paul B. We have held that the child and his parents bear the burden of proving by a preponderance of the evidence that the IEP was inappropriate. *Doe v. Board of Educ.*, 9 F.3d 455, 458 (6th Cir.1993) (citing *Cordrey*, 917 F.2d at 1469; *Doe v. Defendant I*, 898 F.2d 1186, 1191 (6th Cir.1990)). Parents who "unilaterally change their child's placement during the pendency of review proceedings, without the consent of the state or local school officials, do so at their own financial risk." *Florence County School Dist. Four v. Carter*, 510 U.S. 7, ——, 114 S.Ct. 361, 366, 126 L.Ed.2d 284 (1993) (quoting *School Comm. of Burlington v. Department of Educ.*, 471 U.S. 359, 373–74, 105 S.Ct. 1996, 2004–05, 85 L.Ed.2d 385 (1985)). "They are entitled to reimbursement *only* if a federal court concludes both that the public placement violated IDEA, and that the private school placement was proper under the Act." *Id.* The law does not require that the child receive a "Cadillac" education at public expense; an IEP "reasonably calculated to provide educational benefits" suffices. *Doe*, 9 F.3d at 460. If a court determines that the IEP was appropriate, the parents are not entitled to reimbursement for any interim period in which the placement violated 20 U.S.C. § 1415(e)(3) (Supp. 1996), the stay-put rule. *School Comm. of Burlington*, 471 U.S. at 374, 105 S.Ct. at 2004; *see Doe*, 898 F.2d at 1192. On the other hand, if a court determines that the placement the family chose was appropriate, the family may be reimbursed retroactively in a proper situation. *See School Comm. of Burlington*, 471 U.S. at 370, 105 S.Ct. at 2003.

enter judgment for the TDMHMR and the Board.