**IN RE: MIDWAY MOTOR SALES, INC., Debtor.**

**General Motors Acceptance Corporation, Plaintiff,**

v.

**Midway Motor Sales, Inc., et al., Defendants.**

**CASE NUMBER 04–42726 ADVERSARY NUMBER 04–4147**

United States Bankruptcy Court, N.D. Ohio.

Signed December 11, 2008

Kenneth B. Baker, Marc A. Melamed, Cleveland, OH, Michael H. Carpenter, Jeffrey A. Lipps, Angela M. Paul Whitfield, Carpenter Lipps & Leland LLP, Columbus, OH, for Plaintiff.

Melissa M. Macejko, Robert S. Bouffard, Richard J. Thomas, Youngstown, OH, for Defendants.

## MEMORANDUM OPINION REGARDING MOTION FOR SUMMARY JUDGMENT

Honorable Kay Woods, United States Bankruptcy Judge

Before the Court is Motion of Plaintiff GMAC LLC for Summary Judgment

("Motion for Summary Judgment") (Doc. # 130)[1] filed by Plaintiff General Motors Acceptance Corporation ("GMAC") on August 4, 2008. On August 25, 2008, Defendants David A. Flynn and David A. Flynn, Inc. (collectively "Flynn") filed Response in Opposition to Motion for Summary Judgment ("Response") (Doc. # 133). For the reasons given below, the Court finds that the Motion for Summary Judgment should be granted.

This Court has jurisdiction pursuant to 28 U.S.C. § 1334 and the general order of reference (General Order No. 84) entered in this district pursuant to 28 U.S.C. § 157(a). Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(O). The following constitutes the Court's findings of fact and conclusions of law pursuant to FED. R. BANKR. P. 7052.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Debtor Midway Motor Sales, Inc. ("Midway") filed a voluntary chapter 11 petition on June 3, 2004 ("Petition Date"), which was converted to a chapter 7 case on September 24, 2004. Prior to the Petition Date, Midway operated a GMC light duty and medium duty truck dealership ("Dealership") in New Waterford, Ohio. (First Supp. Compl. ¶ 9.) (Doc. # 86.) Sometime in the fall of 2003, Flynn entered into negotiations with Midway to purchase substantially all of the assets of the Dealership. (Mot. Summ. J. at 3.) On or about April 21, 2004, Midway and Flynn entered into a Purchase and Sale Agreement ("Purchase Agreement") for certain assets

of Midway. (*Id.* Ex. C.) Pursuant to the Purchase Agreement, Midway, Midway's president Michael Joseph Mercure, and its vice president Michael James Mercure (collectively, "Seller")[2] agreed to sell and Flynn agreed to purchase:

A. All nonobsolete, new, unused and undamaged parts and accessories for GMC LIGHT DUTY, LIGHT DUTY COMMERCIAL, WORKHORSE, and MEDIUM DUTY vehicles shown in the current GENERAL MOTORS Parts Books at current Cost to dealers as shown in the latest GENERAL MOTORS Parts Books, which are returnable to GENERAL MOTORS at closing. Any obsolete parts shall remain property of the SELLER.

B. All parts price books, shop manuals, sales training materials, sales literature, Stationery and other special supplies.

C. GENERAL MOTORS special service tools.

D. Goodwill associated with the business. The SELLERS [sic] hereby grant the use of the trade name MIDWAY MOTOR SALES INC. at no charge to PURCHASER.

(collectively, the "Assets"). (Purchase Agr. ¶ 1 A–D.)

The Purchase Agreement, which did not include the sale of the shares of Midway, had three distinct components, as follows: (i) provided for Flynn to purchase the Assets for a purchase price of $500,000.00 plus returnable parts ("Purchase Price") (*Id.* ¶¶ 1 and 3); (ii) provided for Flynn to purchase "all new 2004 model GMC LIGHT DUTY, LIGHT DUTY COM-

---

**1.** Unless otherwise noted, all docket numbers in this Opinion refer to documents in this adversary proceeding, Case No. 04–4147.

**2.** The Purchase Agreement defines the Seller as Midway and both Messrs Mercure. In addi-

tion, Messrs Mercure signed the Purchase Agreement in their representative capacities and in their individual capacities. Messrs Mercure undertook certain indemnification obligations in their individual capacities.

MERCIAL, WORKHORSE and MEDIUM DUTY vehicles including demonstrators, if any, on hand as well as those which have been shipped but have not yet arrived at the dealership" ("Vehicles") at "factory invoice price thereon" plus or minus certain specified items (*Id.* ¶ 4); and (iii) provided as a condition that Seller had to arrange for Flynn to lease the premises upon which the Dealership operated, including "any furniture, fixtures and equipment currently in use" thereat for a term of thirty-six (36) months "at a monthly lease payment of five thousand dollars ($5000)[,]" (renewable for 36 months at the same price) (*Id.* ¶ 14). The only part of the Purchase Agreement at issue in this Adversary Proceeding is the first component of the Purchase Agreement, *i.e.*, the sale of the Assets for the Purchase Price.

The returnable parts refund totaled $59,283.31. (Mot. Summ. J. Ex. H.) Thus, the total Purchase Price for the Assets was $559,283.31. Pursuant to the Purchase Agreement, Flynn was required to pay Midway the Purchase Price, as follows:

A. Ten thousand dollars ($10,000) deposit as earnest money to be paid by the PURCHASER to SELLER'S attorney to be held in escrow when this document is executed.[3]

B. A sum of two hundred forty thousand dollars ($240,000) to be paid in cash on the day of closing between PURCHASER AND SELLER. A sum of one hundred twenty-five thousand ($125,000) on first anniversary of closing and a sum of one hundred twenty-five thousand ($125,000) on second anniversary of closing at no interest.

(Purchase Agr. ¶ 3 (emphasis added).)

Prior to closing of the Purchase Agreement, Flynn learned that Midway might be involved with odometer tampering (hereinafter "Odometer Fraud").[4] (Mot. Summ. J. at 4; Resp. at 3.) Two days before closing,[5] on May 26, 2004, Flynn called the President of Midway, Michael Joseph Mercure, to determine whether the rumors concerning Odometer Fraud were true. (Resp. Ex. B and Ex. C at 122.)

Flynn: The rumors abound here that Midway is in odometer fraud problems, is there any truth to this?

Mercure: Not that I'm aware of.

Flynn: You never clocked any Builder Supply [sic] trucks that came off lease?

Mercure: Absolutely not.

Flynn: Okay. Cause I'll be honest with you I don't want to buy a dealership that has that kind of problems.

. . .

Mercure: Yeah, well I can tell you its not true.

Flynn: Okay. I'm taking your word at that—that's all I need.

(Resp. Ex. B (emphasis added).)

Closing on the Purchase Agreement occurred on or about May 28, 2004, pursuant

---

**3.** The $10,000.00 earnest money deposit ("Deposit") was not discussed by either GMAC or Flynn. Flynn refers to $250,000.00 due at closing. (Resp. at 12.) As a result, there appears to be no dispute that the Deposit was (i) not paid at the time the Purchase Agreement was executed and (ii) due at closing of the Purchase Agreement.

**4.** In an action by the Attorney General of Ohio against Midway and GMAC, the Franklin County Court of Common Pleas, on June 1, 2006, found that Midway had altered the odometers on 85–93 vehicles owned by GMAC (but not in GMAC's possession), which were then sold to third parties at auction. GMAC was found to have strict civil liability, but not criminal liability, under O.R.C. 4549.46. (*See* Notice of Plaintiff GMAC LLC of Supplemental Authority Ex. D at 4–5.) (Doc. # 127.)

**5.** The Purchase Agreement provided for closing to occur on May 21, 2004, but there is no dispute that closing occurred on May 28, 2004.

to an order of Judge Richard McMonagle of the Cuyahoga County Common Pleas Court. (First Supp. Compl. ¶ 17.) At closing, Flynn tendered $58,039.98 in cash, which, pursuant to Judge McMonagle's order, was put into an escrow account. (*Id.* ¶¶ 22–23.)

GMAC filed the instant adversary proceeding on August 11, 2004, to determine the validity, extent and priority of its claim against Midway, Flynn, and numerous other parties. The issues in this adversary proceeding have been bifurcated. The two issues are: (i) whether and to what extent Flynn is liable to Midway under the terms of the Purchase Agreement, and (ii) whether GMAC holds the first priority perfected security interest in any proceeds owed to Midway by Flynn under the terms of the Purchase Agreement. The Motion for Summary Judgment and this Opinion cover only the first issue. However, the second issue has been resolved separately.

On October 1, 2008, Elaine B. Greaves, Chapter 7 Trustee for Midway ("Trustee"), filed Motion of the Trustee for an Order Approving Settlement Agreement by and Between the Trustee and GMAC, LLC *fka* General Motors Acceptance Corporation (Main Case 04–42726 Doc. # 226). No party filed an objection or response to Trustee's motion. As a consequence, on November 6, 2008, this Court entered Order Granting Trustee's Motion for Approval of Settlement Agreement with GMAC, LLC *fka* General Motors Acceptance Corporation ("Stipulated Order") (Main Case Doc. # 228). Pursuant to the Stipulated Order, Trustee acknowledges that "GMAC has a valid, binding and enforceable claim in an amount exceeding $1,743,176.18 (the "Claim"), $58,039.98 of which is currently held in escrow. The totality of GMAC's Claim is secured by a first-priority perfected security interest in and lien on the Receivables[.]" (Stip. Order Ex. A at 2.) As a consequence, GMAC holds the first priority perfected security interest in any proceeds owed to Midway by Flynn under the terms of the Purchase Agreement; the only issue to be resolved is whether and to what extent Flynn is liable to Midway under the terms of the Purchase Agreement.

GMAC alleges that Flynn is liable for the Purchase Price because the Purchase Agreement is unambiguous and Flynn has no valid defense to liability. (*Id.* ¶¶ 33–35.) Flynn contends that he is not liable for the Purchase Price because: (i) Flynn has already made substantial payments toward the Purchase Price; (ii) Flynn did not receive the benefit of the bargain because of the Odometer Fraud; and (iii) Flynn is entitled to setoffs as a result of the Odometer Fraud. (*See generally* Resp.)

## II. STANDARD FOR REVIEW

The procedure for granting summary judgment is found in FED. R. CIV. P. 56(c), made applicable to this proceeding through FED. R. BANKR. P. 7056, which provides in part:

> The judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

FED. R. CIV. P. 56(c). Summary judgment is proper if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A fact is material if it could affect the determination of the underlying action. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Tennessee Department of Mental Health & Retardation v.*

*Paul B.*, 88 F.3d 1466, 1472 (6th Cir. 1996). An issue of material fact is genuine if a rational fact-finder could find in favor of either party on the issue. *Anderson*, 477 U.S. at 248–49, 106 S.Ct. 2505; *SPC Plastics Corp. v. Griffith (In re Structurlite Plastics Corp.)*, 224 B.R. 27 (6th Cir. BAP 1998). Thus, summary judgment is inappropriate "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505 (1986).

In a motion for summary judgment, the movant bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548; *Abdulnour v. Campbell Soup Supply Co., LLC*, 502 F.3d 496, 501 (6th Cir. 2007). The burden then shifts to the nonmoving party to demonstrate the existence of a genuine dispute. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 590, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). The evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). However, in responding to a proper motion for summary judgment, the nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989) (quoting *Anderson*, 477 U.S. at 257, 106 S.Ct. 2505). That is, the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact. *Street*, 886 F.2d at 1479. Moreover, the mere existence of a scintilla of evidence in support of the non-movant's position is insufficient. *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. The nonmoving party must present evidence upon which a reasonable jury could find in its favor. *Id.*

### III. ANALYSIS

GMAC contends that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law because: (i) the Purchase Agreement is clear and unambiguous; (ii) Flynn is obligated to pay the Purchase Price to Midway; and (iii) Flynn has not paid the Purchase Price to Midway.[6] Flynn does not dispute that the Purchase Agreement is clear and unambiguous. He does, however, contend genuine issues of material fact preclude judgment as a matter of law because Flynn: (i) has made substantial payments toward the Purchase Price; (ii) did not receive the benefit of the bargain because of the Odometer Fraud; and (iii) is entitled to various setoffs as a result of the Odometer Fraud.

### A. The Court's January 10, 2008 Order

Both parties reference this Court's January 10, 2008, Order ("Rule 9019 Order") (Main Case Doc. # 211), which denied Trustee's motion for an order approving a settlement with Flynn. The parties are at odds about whether and to what extent the Court should "reconsider" the Rule 9019 Order. In the Rule 9019 Order, the Court denied Trustee's motion to compromise because the Court found that the proposed settlement was not in the best interests of the estate. The standard for analyzing whether a compromise and settlement is in the best interests of a bankruptcy estate are wholly different from the standard for determining a motion for summary judg-

---

**6.** At closing, Flynn paid $58,039.98, which is still being held in escrow. Thus, although Flynn has tendered partial payment of the Purchase Price, Midway has received none of the Purchase Price.

ment. *See Reynolds v. Comm'r*, 861 F.2d 469, 473 (6th Cir. 1988) *and In re Parkview Hospital–Osteopathic Med. Ctr.*, 211 B.R. 603, 608 (Bankr. N.D. Ohio 1996). As a consequence, the Rule 9019 Order is not dispositive in the Court's analysis of the Motion for Summary Judgment. The Rule 9019 Order stands for what it is—a final order that denied Trustee's motion to compromise. There is no need for the Court to "reconsider" or reassess any part of the Rule 9019 Order.

## B. Breach of Contract

GMAC asserts that Flynn has breached the terms of the Purchase Agreement by not paying the Purchase Price to Midway. Flynn counters that he paid a portion of the Purchase Price and was not required to pay the remainder of the Purchase Price because of the Odometer Fraud.

█ A breach of contract claim in Ohio [7] requires the following: (i) the existence of a binding contract, (ii) the breaching party's failure to perform its contractual obligations without legal excuse, (iii) the non-breaching party's substantial performance of the contract and (iv) damages suffered by the non-breaching party as a result of the breach. *See e.g., Am. Sales, Inc. v. Boffo*, 71 Ohio App. 3d 168, 593 N.E.2d 316 (1991); *Garofalo v. Chicago Title Ins. Co.*, 104 Ohio App. 3d 95, 661 N.E.2d 218 (1995).

Because GMAC bears the initial burden of establishing that there is no genuine issue of material fact that Flynn breached the Purchase Agreement, GMAC must show that: (i) the Purchase Agreement is a valid contract between Midway and Flynn; (ii) Flynn was required, but failed, to pay the Purchase Price to Midway; (iii) Mid-

way substantially performed the Purchase Agreement; and (iv) Midway was damaged as a result of Flynn's failure to pay the Purchase Price. GMAC has carried this initial burden.

GMAC has established, and Flynn has not controverted, that the Purchase Agreement is a valid, enforceable contract. Attached to the Motion for Summary Judgment as Exhibit C is the Purchase Agreement. The Purchase Agreement is executed by Flynn, as Purchaser, and Midway and Messrs Mercure, as Seller. (Mot. Summ. J. Ex. C.) Moreover, Flynn acknowledges in the Response that Midway and Flynn entered into the Purchase Agreement. (Resp. at 3.) Thus, there is no dispute that the Purchase Agreement is a valid contract between Midway and Flynn.

GMAC has also established that Flynn breached the Purchase Agreement by failing to pay the Purchase Price in consideration of receipt of the Assets. Pursuant to the terms of the Purchase Agreement, Flynn agreed to purchase the Assets for the <u>cash</u> Purchase Price. On the day of closing, Flynn deposited $58,039.98 of the $250,000.00 cash due at closing into an escrow account. (Mot. Summ. J. Ex. G at 20–21.) Flynn did not make the $125,000.00 payment to Midway on the first anniversary of the closing. (*Id.* at 22–23.) Nor did Flynn make the $125,000.00 payment to Midway on the second anniversary of the closing. (*Id.*) Moreover, after Flynn received the refund for returnable parts from GMC, which totaled $59,283.31 (*see* Mot. Summ. J. Ex. H), Flynn failed to forward the refund to Midway as required by the Purchase Agreement. (Mot. Summ. J. Ex. G at 27.) Flynn does not dispute that he owes the Purchase Price.[8] Nor

---

7. The Purchase Agreement is governed by and is to be interpreted pursuant to the laws of the state of Ohio. (Purchase Agr. ¶ 20.)

8. Flynn contends that he made certain other payments for which Flynn is entitled to be credited as payment toward the initial payment of the Purchase Price. (Resp. at 13, 15–

does Flynn dispute that he paid only $58,039.98 in cash at closing. (*See id.* at 20–21.) As a result, GMAC has shown that Flynn breached the Purchase Agreement by failing to pay Midway the Purchase Price for the Assets.

Midway performed its obligations under the Purchase Agreement by transferring the Assets to Flynn, which are now in Flynn's possession. (Mot. Summ. J. at 9–10; Resp. at 19.)

Midway has been damaged by Flynn's breach of the Purchase Agreement in the amount of $501,243.33, which is the unpaid portion of the Purchase Price (*i.e.* $559,283.31 less the amount of $58,039.98 held in escrow).

GMAC has shown that there is no genuine issue of material fact that Flynn breached the Purchase Agreement. Thus, under FED. R. CIV. P. 56(c) and FED. R. BANKR. P. 7056, the burden now shifts to Flynn to show that there is a genuine issue of material fact that precludes judgment in favor of GMAC.

### C. Flynn's Defenses to the Breach of Contract

Flynn asserts that there are genuine issues of material fact that preclude judgment as a matter of law in favor of GMAC regarding whether: (i) Flynn has made substantial payments toward the Purchase Price; (ii) Flynn owes the remainder of the Purchase Price because Flynn did not receive the benefit of the bargain as a result of the Odometer Fraud; and (iii) Flynn is entitled to a setoff based on the Odometer Fraud. The Court will address each of Flynn's arguments in turn.

### 1. Partial Payment of Purchase Price

Flynn asserts that he has made substantial payments, as outlined on page 12 of the Response, that should be credited against the Purchase Price. GMAC contends that the Purchase Agreement is clear and unambiguous and does not provide for crediting such payments.

 When courts review a contract, the primary goal is to ascertain and give effect to the intent of the parties. *City of St. Marys v. Auglaize County Bd. of Comm'rs*, 115 Ohio St. 3d 387, 2007-Ohio-5026, ¶ 18, 875 N.E.2d 561 (2007). However, when a contract is clear and unambiguous, courts are constrained to apply the plain language of the contract. *Id.* The Purchase Agreement is clear and unambiguous;[9] accordingly, this Court is constrained by the plain language of the Purchase Agreement.

 Flynn makes at least two references to the Court "examining the contract as a whole" and "focus[ing] on the Purchase Agreement as a whole." (Resp. at 2 and 11.) Despite these references, however, Flynn never explains what documents the Court should examine in looking at the "whole" contract. The only document that has been presented to the Court for examination is the Purchase and Sale Agreement, dated April 21, 2004, by and between Midway, Michael Joseph Mercure and Michael James Mercure, as Seller, and David A. Flynn and/or his nominee, as Purchaser. Flynn has failed to produce any further or additional documentation to the Court as constituting the "whole" agreement. Indeed, Flynn has not directed the

---

16.) In addition, Flynn argues that he is entitled to set off the payments of the Purchase Price due on the first and second anniversaries of closing because Flynn did not receive the benefit of the bargain. Despite these contentions, however, at no time has Flynn ar-

gued that the Purchase Agreement did not require Flynn to pay $500,000.00 plus returnable parts inventory for the Assets.

**9.** GMAC affirmatively argues this point and Flynn does not contend otherwise.

Court to look outside the four corners of the Purchase Agreement, and Flynn has acknowledged that the Purchase Agreement has not been modified. (Mot. Summ. J. Ex. M at 4.)

Moreover, in arguing that the Court must consider the "whole agreement," Flynn states, "Flynn paid GMAC in excess of $3.5 million to satisfy a substantial portion of the Purchase Agreement." (Resp. at 20 (emphasis added).) To the extent Flynn may have paid GMAC (whether or not in lieu of paying Seller) $3.5 million or any other amount for the Vehicles or any other assets relating to operation of the Dealership, such alleged payments were in addition to the Purchase Price for the Assets and/or outside the Purchase Agreement.[10] The Purchase Agreement makes no reference to paying anyone other than Seller for the Assets. Because GMAC is not a party to the Purchase Agreement, it appears that Flynn is attempting to conflate two or more agreements (not one "whole agreement") relating to the Dealership when he describes his obligations under the Purchase Agreement. The Purchase Agreement stands alone and is not contingent upon Flynn's performance to GMAC or GMAC's performance to Flynn. Although there are certain conditions precedent in the Purchase Agreement,[11] the Court finds that they were either satisfied or waived since closing of the Purchase Agreement occurred.

The plain language of the Purchase Agreement states that the Purchase Price for the Assets is "$500,000.00 plus returnable parts to General Motors." (Purchase Agr. ¶ 3.) Moreover, the Purchase Agreement provides that the "price shall be paid ... in cash[.]" (*Id.* (emphasis added).) Thus, under the plain language of the Purchase Agreement, Flynn is required to pay Midway the Purchase Price of $559,283.31 in cash.

Flynn contends that he made five separate payments, which should be credited toward the Purchase Price, as follows:

(i) $108,865.80 for the holdback payment.[12]

(ii) $32,985.81 for Midway's sales tax obligations.

(iii) $17,044.22 for Midway payroll.

(iv) $29,814.19 for outstanding warranties and credit life policies.[13]

(v) $3,300.00 in deposits.

---

10. Paragraph 4 of the Purchase Agreement provides that Seller "agrees to sell and Purchaser agrees to buy from Seller all [Vehicles] ... at factory invoice price less vehicle holdback ...." Although the Purchase Agreement addresses the purchase and sale of the Vehicles, the price for the Vehicles is in addition to—not included within—the Purchase Price. By Flynn's own admission, he paid GMAC rather than Midway for the Vehicles. Despite this admission, Flynn seeks, without justification, to setoff the "holdback" relating to the Vehicles from the Purchase Price.

11. Paragraph 5 of the Purchase Agreement conditions the Agreement upon Purchaser being granted franchises in Seller's existing facilities by General Motors. Paragraph 14 further conditions Purchaser's obligations upon Seller arranging for Purchaser to lease and Purchaser entering into a lease agreement for the premises that housed Midway's business operations. Last, paragraph 17 contains the condition that General Motors had to issue GMC Light Duty, Light Duty Commercial, Workhorse and Medium Duty Sales and Service Agreements to Purchaser in New Waterford, Ohio and General Motors' acceptance of Seller's resignation. These are the only conditions precedent in the Purchase Agreement.

12. Flynn acknowledges that he wants a credit against the Purchase Price owing to Midway for this amount, which Flynn allegedly "overpaid" GMAC for the Vehicles. (Resp. at 12.)

13. Flynn admits that he has not paid Midway's sales tax obligations or the amounts listed for the outstanding warranties and credit life policies. (Resp. at 12.)

(Resp. at 12.) Flynn argues that these payments should be credited toward the Purchase Price based on two handwritten pages and two other pages that Flynn denominates as settlement term sheets prepared on the date of closing. (Resp. Ex. G.)

The first of two handwritten pages has "5–28–04" in the upper right corner and indicates $250,000.00 as the "total amount paid at closing," "less credit for holdback missing equipment and physical damage" of $108,865.80, "less deposits to be assumed William Kunkle" of $300.00, "less payroll for May 19th to May 26th estimate 14203.52 x 1.2" in the amount of $17,044.22, and "total" of $123,789.98. (*Id.* at 1.) This page was signed by "Michael Mercure" and "Mark W. Beith." (*Id.*) It is unclear whether Michael Mercure and Mark W. Beith signed the first handwritten page in their individual or representative capacities.[14] However, this first handwritten page was not signed by any of the other parties to the Purchase Agreement.

The second handwritten page also has "5–28–04" in the upper right corner and appears to show the same "credits" but increases the credit amount for "deposits to be assumed William Kunkle" from $300.000 to $3,300.00; and adds the following "credits:" (i) "sales tax on outstanding vehicle sales" in the amount of $32,985.81; (ii) "outstanding warranties and credit life policies" in the amount of $29,814.19; and (iii) an illegible deduction. (*Id.* at 2.) The second handwritten page shows a balance due to Midway of $58,039.98. (*Id.*) Because this second page is very difficult to read (*See* Resp. Ex. G.), the numbers used herein come from the Response rather than Exhibit G. However, the numbers from the Response do not match the total amount due to Midway shown on the second handwritten page. Significantly, this second handwritten page is not signed by anyone.

The Purchase Agreement requires the first $250,000.00 of the Purchase Price to be paid in cash at closing. Therefore, for the "credits" shown in the handwritten pages to be valid partial payments of the Purchase Price, there must have been a valid modification or amendment to the Purchase Agreement relieving Flynn from the obligation to pay Midway the Purchase Price in cash. However, both parties agree that the Purchase Agreement was never modified or amended. (*See* Resp. at 15–17; Mot. Summ. J. Ex. M at 4.) Moreover, the first handwritten page was not signed by all parties to the Purchase Agreement, and the second handwritten page was never signed by anyone. Thus, the requirement in the Purchase Agreement that the Purchase Price be paid "in cash on the day of closing" (Purchase Agr. ¶ 3) was never changed; consequently, Flynn was under a duty to pay Midway the Purchase Price in cash on the day of closing. Although Flynn contends that "the parties ... deviate[d] from certain portions of the Purchase Agreement" (Resp. at 15), only Flynn appears to have deviated from and, thus, breached the Purchase Agreement.

Because Flynn was required by the terms of the Purchase Agreement to pay Midway the Purchase Price in cash, any other payment or credit does not satisfy Flynn's obligation thereunder. The second handwritten page may show <u>why</u> Flynn paid only $58,039.98 into escrow at closing, but it does not demonstrate that Flynn was <u>entitled</u> to do so. As a result, Flynn has not shown a genuine issue of material fact regarding whether he made substantial payments toward the Purchase Price.

---

**14.** It is also unknown whether "Michael Mercure" is Michael Joseph Mercure or Michael James Mercure.

## 2. Benefit of the Bargain

Flynn further asserts that there is a genuine issue of material fact whether he owes the payments due on the first and second anniversaries of closing ("Anniversary Payments") because Flynn did not receive the benefit of the bargain as a result of the Odometer Fraud. GMAC contends that Flynn is enjoying the benefit of the bargain by earning profits at the dealership where Midway was formerly located.

■ To receive the benefit of its bargain, a party must be in as good a position as it would have been had the other party fully performed under the contract. *Rasnick v. Tubbs*, 126 Ohio App. 3d 431, 437, 710 N.E.2d 750 (1998). Thus, for Flynn to receive the benefit of the bargain, Midway had to fully perform the Purchase Agreement. Under the terms of the Purchase Agreement, Midway's performance included (i) executing documents to resign its franchise, (ii) turning over customer records, (iii) arranging a long term lease for Flynn, (iv) selling Vehicles to Flynn at factory invoice price as adjusted, and (v) transferring the Assets to Flynn for the Purchase Price. (*See generally* Purchase Agr.)

■ Flynn argues in the Response that he did not receive the benefit of the bargain because of Odometer Fraud at Midway. However, Flynn fails to connect the Odometer Fraud to Midway's performance of the Purchase Agreement or the transferred Assets. Flynn does not point to any portion of the Purchase Agreement that Midway failed to perform because of the Odometer Fraud. Nor does Flynn allege that (i) Midway failed to turn over any

part of the Assets as a result of the Odometer Fraud, or (ii) the Assets were damaged or worth less as a result of the Odometer Fraud. Flynn's only argument—without any supporting facts—is that, as a result of the Odometer Fraud, he suffered "nearly $250,000 in losses in the first two years of operation." (Resp. at 19.) Flynn argues that he "did not receive the benefit of his bargain based upon losses suffered due to the tainted reputation of the business he purchased because of the odometer rollbacks." (Resp. at 16.) Although not clearly articulated in these words, the Court interprets Flynn's argument to be that Flynn did not receive the benefit of the bargain because he did not receive the goodwill described in the Assets.[15] (*See id.*) Flynn attempts to link the Odometer Fraud with unspecified damages by stating, "Flynn Defendants claim that they have been defrauded and they suffered losses when the odometer rollback came into public light." (Resp. at 2.) However, the Odometer Fraud came to "public light" by way of pervasive rumors before Flynn decided to go forward with closing the transaction. Flynn's pre-closing knowledge of the "abound[ing]" rumors concerning Odometer Fraud undercuts any argument that Flynn believed he was purchasing a Dealership with a pristine or unsullied reputation.

Flynn heard rumors about the Odometer Fraud before closing took place. (Mot. Summ. J. Ex. B at 24; Resp. at 3,4, and 5.) After hearing rumors about Odometer Fraud, Flynn proceeded to contact other local car retailers, employees of Midway, and various employees of GMAC. (Mot. Summ. J. at 4; Resp. at 3–11.) Although

---

**15.** No portion of the Purchase Price was attributed to goodwill. Seller made no representations about its reputation or the value of the goodwill. Indeed, Flynn acknowledges that the Odometer Fraud occurred prior to execution of the Purchase Agreement and the Purchase Agreement only called for Seller to conduct <u>future</u> business at the Dealership in "a normal and regular way[.]" (Purchase Agr. ¶ 15.)

no one confirmed the rumors of Odometer Fraud as fact, each person with whom Flynn spoke confirmed that he or she had heard rumors or had concerns about Odometer Fraud at Midway. (*See generally* Resp. at 3–11.) Eventually, Flynn called the President of Midway, Michael Joseph Mercure, and asked about the truth of the Odometer Fraud at Midway because "rumors abound" about the allegation. (Resp. Ex. C at 122–23.) Although Mercure denied the existence any Odometer Fraud, the call to Mercure shows that Flynn was aware, prior to closing, that Midway's reputation had been tainted by Odometer Fraud rumors.

When Flynn closed the Purchase Agreement two days after the phone conversation with Mercure, Flynn was aware that Midway's reputation—and, thus, the goodwill he was purchasing—was "tainted." Whether the Midway's reputation was tainted due to false accusations of Odometer Fraud or actual Odometer Fraud, Flynn knew that, in any event, there was likely to be an adverse impact on the goodwill element of the Assets. As a result, Midway's full performance of the Purchase Agreement did not include the transfer of unsullied goodwill to Flynn but, instead, included the transfer of goodwill in light of the abundant rumors of Odometer Fraud. Thus, the only damages Flynn could possibly assert in connection with his "benefit of the bargain" argument would be the difference between losses caused by tainted reputation due to <u>actual</u> Odometer Fraud and losses caused by tainted reputation due to <u>rumors</u> of Odometer Fraud. Flynn has not alleged the existence of any such damages. Nor has Flynn presented any evidence of such damages.

■ Because Midway fully performed its obligations under the Purchase Agreement, Flynn received the benefit of the bargain. "When the terms included in an existing contract are clear and unambiguous, [the Court] cannot create a new contract by finding an intent not expressed in the clear and unambiguous language of the written contract." *Hamilton Ins. Servs., Inc. v. Nationwide Ins. Cos.*, 86 Ohio St. 3d 270, 273, 714 N.E.2d 898 (1999). Here, the Purchase Agreement is clear, unambiguous, and includes no representation or warranty as to the quality of the goodwill being sold. The Purchase Agreement described Midway's performance obligations, and Midway fulfilled those obligations. As a result, Flynn received the benefit of the bargain. Therefore, Flynn has failed to show a genuine issue of material fact regarding whether Flynn received the benefit of the bargain.

Flynn's "benefit of the bargain" argument, when distilled to its essence, is that Mercure lied to him about the truth of the Odometer Fraud and, as a consequence, such lie should relieve Flynn of his obligation to make the Anniversary Payments. Flynn has failed to allege any legal basis in support of this argument.

### 3. Setoff

Last, Flynn asserts that there is a genuine issue of material fact regarding whether Flynn is entitled to a setoff because of the Odometer Fraud.

■ Setoff is governed by § 553 of the Bankruptcy Code, which provides in part:
this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case
. . . .

11 U.S.C. § 553(a) (West 2008). Setoff avoids the absurdity of making A pay B when B owes A. *See Studley v. Boylston Nat'l Bank*, 229 U.S. 523, 528, 33 S.Ct. 806,

57 L.Ed. 1313 (1913). Section 553 does not create the right of setoff; it simply preserves setoff rights that would otherwise exist under state law. *U.S. Aeroteam, Inc. v. Delphi Automotive Sys. (In re U.S. Aeroteam, Inc.)*, 327 B.R. 852, 862 (Bankr. S.D. Ohio 2005).

 The creditor bears the burden of showing that it has the right to a setoff under § 553. *First Nat'l Bank of Louisville v. Hurricane Elkhorn Coal Corp. II*, 763 F.2d 188, 190 (6th Cir. 1985). Therefore, in order for a creditor to exercise the right of setoff it must show (i) a pre-petition debt owing by the creditor to the debtor; (ii) a pre-petition claim of the creditor against the debtor; (iii) that the debt and claim are mutual obligations; and (iv) a right to setoff the debts under state law. *Roberds, Inc. v. Lumbermen's Mutual Casualty Co. (In re Roberds, Inc.)*, 285 B.R. 651, 656 (Bankr. S.D. Ohio 2002).

 Mutuality of obligations requires that the obligations be between the same two parties. *In re Gregg*, 371 B.R. 817, 820 (Bankr. E.D. Tenn. 2007). Thus, as long as the debtor and creditor are the same two parties, setoff allows a creditor to set off an obligation owed to the debtor when the debtor owes an obligation to the creditor. *See* 11 U.S.C. § 553(a) (West 2008). Courts strictly construe the mutuality requirement. *Wooten v. Vicksburg Refining, Inc.*, 95 B.R. 404, 411 (Bankr. W.D. L.A. 1988). However, the obligations do not need to arise from the same transaction or be of the same character. *In re Gregg*, 371 B.R. at 820; *see also Camelback Hospital, Inc. v. Buckenmaier (In re Buckenmaier)*, 127 B.R. 233, 238 (9th Cir. BAP 1991) (stating that contract and tort claims may be set off from each other).[16]

 Flynn spends page after page in the Response detailing how GMAC allegedly committed a fraud against Flynn. (*See* Resp. at 3–11.) Flynn concludes with the statement, "It is clear that Flynn's affirmative defenses regarding the improper conduct of GMAC are proper, and based upon those affirmative defenses, summary judgment is not proper." (Resp. at 11.) However, Flynn fails to state any facts that relieve him of his obligations and liability under the Purchase Agreement to Midway based on alleged improper conduct of GMAC. Flynn's argument that he has the right to set off a portion of the Purchase Price owing to Midway because GMAC allegedly had knowledge of the Odometer Fraud and misled Flynn about the Odometer Fraud totally misses the mark.

Even assuming, *arguendo*, that all of Flynn's accusations against GMAC are true, Flynn's claim against GMAC for fraud does not and cannot provide Flynn any right of setoff against the debt he owes to Midway because there is no mutuality. Pursuant to the Purchase Agreement, Flynn owes Midway. Pursuant to Flynn's argument, GMAC is liable to Flynn. Therefore, there is no mutuality. Flynn owes Midway (not GMAC) under the Purchase Agreement. Flynn's alleged cause of action against GMAC cannot set off Flynn's liability to Midway under the Purchase Agreement. As a result, Flynn has failed to establish a genuine issue of material fact with regard to a setoff right because of GMAC's alleged improper conduct.

Flynn also asserts that there is a genuine issue of material fact with regard to

---

**16.** One of the significant differences between setoff and recoupment is that in setoff the mutual obligations owed between the parties are not necessarily from the same transaction while in recoupment the mutual obligations arise from the same transaction. *Newbery Corp. v. Fireman's Fund Ins. Co.*, 95 F.3d 1392, 1398–400 (9th Cir. 1996).

setoff because Midway committed a fraud against Flynn.

In Ohio, when a contract exists between two parties, a tort can only exist if a party breaches a duty that is owed to the other party independent of the contract. *Battista v. Lebanon Trotting Ass'n*, 538 F.2d 111, 117 (6th Cir. 1976). Moreover, if the party's alleged injury is the loss of the benefit of the bargain, there is no tort injury because a party's duty to perform arises solely from the contract. *Id.* Simply put, the alleged tort injury must be unique and separate from any alleged breach of contract injury. *Medical Billing, Inc. v. Medical Mgmt. Sciences, Inc.*, 212 F.3d 332, 338 (6th Cir. 2000).

Flynn claims that Midway's misrepresentation regarding the Odometer Fraud adversely affected the value of the Assets Flynn received under the Purchase Agreement. (Resp. at 14.) Flynn further asserts that the fraud claim against Midway can be used to set off part or all of the Purchase Price that Flynn owes to Midway. (*Id.*) However, Flynn's fraud claim against Midway fails because Flynn's alleged injury for fraud is the same as Flynn's alleged injury for breach of contract.

Flynn's alleged injury for fraud is loss of profits from the tainted reputation of Midway. This is the same injury Flynn allegedly suffered because he did not receive the benefit of the bargain. Flynn's third argument is simply a restatement—under the heading of fraud—of the breach of contract claim that he did not receive the benefit of the bargain. Because Flynn fails to state a valid fraud claim, Flynn cannot use this alleged fraud claim as a setoff against Flynn's liability to Midway for the Purchase Price.

Moreover, as discussed above, because Flynn knew the goodwill was tainted by rumors of Odometer Fraud, any damages Flynn could recover would be limited to the difference between losses caused by tainted reputation due to <u>actual</u> Odometer Fraud and losses caused by tainted reputation due to <u>rumors</u> of Odometer Fraud. Flynn has not alleged any such damages nor provided any evidence of such damages. As a result, even if, *arguendo*, Flynn had alleged a fraud claim distinct from the breach of contract claim, Flynn fails to allege any possible damages that could be used as a setoff against the Purchase Price.

### D. Violation of the Automatic Stay

GMAC argues that Flynn violated the automatic stay in 11 U.S.C. § 362(a)(7) by setting off amounts due to Midway. (Mot. Summ J. at 15.) GMAC contends that because of this violation, Flynn has unclean hands and should not now be allowed any setoff. (*Id.*) Flynn contends that the alleged setoffs occurred prior to the bankruptcy filing and, therefore, did not violate the automatic stay. (Resp. at 18.)

Section 362(a)(7) automatically stays "the setoff of any debt owing to the debtor that arose before the commencement of the case under this title against any claim against the debtor." After imposition of the automatic stay, a creditor must move for and be granted relief from stay under § 362(d) to exercise a valid setoff. Flynn violated the automatic stay in § 362(a)(7) by taking a setoff without permission of the Court.

Midway filed its petition under chapter 11 on June 3, 2004. The Purchase Agreement provides that Flynn was to make two Anniversary Payments, as follows: (i) $125,000.00 on the first anniversary of closing and (ii) $125,000.00 on the second anniversary of closing. (Purchase Agr. ¶ 3.) Closing occurred on May 28, 2004, so the

Anniversary Payments were due on May 28, 2005, and May 28, 2006, respectively.

Although Flynn generally argues that he has not violated the automatic stay because closing occurred pre-petition, Flynn's "benefit of the bargain" argument acknowledges that Flynn did not pay the post-petition Anniversary Payments. (Resp. at 16, 19.) Thus, Flynn admits that he exercised an unauthorized setoff of the Purchase Price by refusing to make the Anniversary Payments on the basis that Flynn allegedly did not receive the benefit of the bargain. Assuming, *arguendo*, that Flynn had any right of setoff for the Anniversary Payments, Flynn was required to obtain relief from the § 362 stay before exercising such right of setoff. Flynn's refusal to make the Anniversary Payments was not, therefore, a valid exercise of setoff because Flynn never moved this Court for relief from stay.

Because the Court has determined that Flynn has no setoff rights, however, it need not reach the issue of whether Flynn's "unclean hands" prevents the allowance of setoff.

### IV. Conclusion

The only issue currently before the Court is whether and to what extent Flynn is liable to Midway under the terms of the Purchase Agreement. GMAC established that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law regarding Flynn's liability to pay the Purchase Price to Midway pursuant to the terms of the Purchase Agreement. Flynn failed to show any genuine issue of material fact regarding his liability to pay the Purchase Price. Therefore, pursuant to the Purchase Agreement, Flynn is liable to Midway for $501,243.33, which represents the total Purchase Price owed to Midway ($559,283.31) less the amount held in escrow ($58,039.98).

For the reasons set forth above, GMAC's Motion for Summary Judgment will be granted.

An appropriate order will follow.

### ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

For the reasons set forth in this Court's Memorandum Opinion entered on this date, the Court hereby grants Motion of Plaintiff GMAC LLC for Summary Judgment. Flynn is liable to Midway for $501,243.33, which represents the total Purchase Price owed to Midway ($559,283.31) less the amount held in escrow ($58,039.98).

**IT IS SO ORDERED.**