RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 22a0133p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

REFORM AMERICA; MARK HARRINGTON,

*Plaintiffs-Appellants*,

*v.*

CITY OF DETROIT, MICHIGAN; DARIN SZILAGY, individually and in his official capacity as a Police Commander, City of Detroit Police Department; KURT WORBOYS, individually and in his official capacity as a Police Captain, City of Detroit Police Department; RONALD LACH, individually and in his official capacity as a police officer, City of Detroit Police Department,

*Defendants-Appellees*.

No. 21-1552

─────────────────

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:19-cv-12728—Laurie J. Michelson, District Judge.

Argued: March 10, 2022

Decided and Filed: June 17, 2022

Before: McKEAGUE, STRANCH, and BUSH, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Robert Joseph Muise, AMERICAN FREEDOM LAW CENTER, Ann Arbor, Michigan, for Appellants. Sheri L. Whyte, CITY OF DETROIT LAW DEPARTMENT, Detroit, Michigan, for Appellees. **ON BRIEF:** Robert Joseph Muise, AMERICAN FREEDOM LAW CENTER, Ann Arbor, Michigan, for Appellants. Sheri L. Whyte, CITY OF DETROIT LAW DEPARTMENT, Detroit, Michigan, for Appellees.

———————————

**OPINION**

———————————

JOHN K. BUSH, Circuit Judge.   Reform America, a nonprofit corporation that does business as Created Equal, is an organization that engages in anti-abortion protests.  To that end, the group and its founder, Mark Harrington, sought to demonstrate at the Democratic Party's presidential-primary debates in Detroit, Michigan, in the summer of 2019. In response to security concerns, however, the Detroit Police Department ("DPD") imposed and enforced several measures that impeded the group's speech.  A "restricted area" blocked access to the debate venue's immediate vicinity.   Protestors were divided into "right-leaning" and "left-leaning" camps and were barred from commingling.  And Harrington himself was even briefly detained after a confrontation with police.

Fed up with the speech restrictions, Harrington and his group eventually abandoned the site for good.  They also filed a federal complaint alleging violations of the First and Fourth Amendments and the Equal Protection Clause of the Fourteenth Amendment.  But the district court granted summary judgment to defendants—the City of Detroit and three individual officers—reasoning that no constitutional violations occurred. Likewise discerning no violations, we affirm.

**I.**

On July 30 and 31, 2019, candidates for the Democratic Party's nomination in the 2020 presidential election gathered for a pair of televised debates at the Fox Theatre in Detroit.  Given the political salience of the event, it attracted many attendees, as well as protestors of all ideological stripes.  Among the latter was Created Equal.  As part of its effort to expose what it terms "the atrocity of abortion," the group says that it often attends public events to display posters with graphic images of aborted fetuses, distribute anti-abortion literature, and "engag[e] in civil discussions with those who support abortion."  And during the events in question, group members hoped to do so in the debates' immediate vicinity, where they believed their message would have the greatest impact.

Yet the group would soon encounter several obstacles to its plan.  After the Democratic National Committee had selected Detroit as the debates' location, media and law enforcement began to collaborate on how to successfully execute the event.  Together, DPD, the United States Secret Service, the Department of Homeland Security, CNN (which would televise the debates), and Olympia Entertainment (which owns and operates the Fox Theatre), devised a surrounding "restricted area" to protect the candidates and ensure order.  The geographic scope of that area is depicted with red and black lines on the diagram below.[1]  All told, it comprised the Fox Theatre itself, the nearby parking lot of the St. John's Church, the two Comerica Park parking lots to the east, and three additional blocks to the south.  The restricted area thus totaled just under eight square blocks.



---

[1]This diagram appears at multiple points in the record.  *See, e.g.*, Exhibit 3, R. 20-3; Op. & Order at 3, R. 33.  Commander Szilagy added the red lines with a pen during his deposition.

Realizing that hosting twenty leading politicians could foster potential threats, DPD's officers took several measures to secure the restricted area. It was swept for explosives and closed to vehicular traffic. Though pedestrians did not have to undergo a security screening to enter the restricted area, they could do so only if they held either media credentials or tickets for the debate.[2] Even for ticketholders permitted into the restricted area, the police prohibited protest activities. Though protestors were free to speak and handbill almost anywhere *outside* the restricted area, the only speech activities permitted within it unfolded at a "candidate support corral" that CNN had established at one of the privately owned Comerica Park parking lots depicted above. And when those supporters of Democratic candidates strayed from the "corral" to demonstrate elsewhere in the restricted area, DPD officers promptly escorted them back.

Members of Created Equal discovered all this at about 6 p.m. on July 30, when they arrived to begin their protest. They first sought to enter the restricted area from the north, near where the above diagram shows the intersection of Fisher Freeway and Woodward Avenue (the road that bisects the restricted area). When group members arrived at the boundary of the restricted area, DPD Sergeant Jay Everitt asked them—as captured on Harrington's own bodycam footage—"You got a ticket?" Harrington responded, "No." Everitt then informed the group that it could not access the restricted area without presenting the proper credentials. Harrington loudly objected that the officers had established a "police state," but he and the group eventually walked away.

Moving eastward, the group next tried to enter the restricted area from the eastern side of Woodward Avenue. But it was intercepted again by DPD officers; this time, Officers Allyne and Thomas. Officer Allyne asked the group if its members held tickets to the debate. Harrington responded, "No. We just have the First Amendment." When officers explained that entry into the restricted area required tickets, Harrington again objected that "this isn't Venezuela" or a "police state." He also began to argue with DPD Captain Kurt Worboys, who had been standing near Officer Allyne. Soon after, another officer, Lieutenant Brandon Cole, began to explain that

---

[2]Though there is some uncertainty, apparently, about which credentials sufficed—i.e., debate tickets only, or both tickets and media credentials—all agree that credentials of some kind were needed to enter the restricted area and that it was inaccessible to the general public. *See* Harrington Dec. ¶21, R. 20-2; *see also* Szilagy Dep. at 34:19–35:9, R. 24-2.

the group was free to protest anywhere it wanted outside the restricted area or within "free speech areas" about three blocks south, in Grand Circus Park. Harrington objected once again to the restrictions, but the interaction broke off and the group continued to walk eastward.

Created Equal then ventured into the parking lot of the St. John's Church, enclosed in the above diagram with red lines. Once there, group members briefly displayed their signs by leaning them against the parking lot's fence so that they faced Woodward Avenue. Seeing this, however, Captain Worboys and Officer Cole told the group that the church parking lot was private property and that Created Equal was not permitted to be there. Yet rather than leave, Harrington objected that several media personnel were freely operating within the lot. He also argued that he could not be made to leave until the property owner had personally instructed him to. Captain Worboys responded that the "owner" (technically, an Olympia affiliate leasing the lot to host the media personnel present) had already informed officers that it did not want Created Equal on the premises.

Having noticed the unfolding altercation, DPD Commander Darin Szilagy stepped in. Commander Szilagy was then serving as DPD's "tactical lead," charged with maintaining the integrity of the restricted area and coordinating the response to potential emergencies. Szilagy likewise informed Harrington that someone from Olympia had requested that the group leave. Szilagy also explained that DPD was not biased against Created Equal's speech but simply wanted to maintain event security by enforcing the restricted area. After Harrington again objected that officers were permitting the media (but not Created Equal) to remain in the lot, Captain Worboys explained that CNN was allowed to be there because it had paid to do so.

Still, however, Harrington refused to leave the church parking lot and continued to argue with officers. Commander Szilagy responded that he did not "have time" for the discussion and ordered the surrounding officers to arrest Harrington. Officers held Harrington's hands behind his back and began to place him in flex cuffs. Yet Harrington relented and agreed to leave. Officers released him and escorted the group to the lot's exit—a large gap in the surrounding fence.

Created Equal next traveled about three blocks south to Grand Circus Park—the location of the "free speech areas." Upon their arrival, group members established a protest site in the park's western portion, labeled "Free Speech Area 2" ("FSA 2") on the above diagram. The group suffered no interference with its protest activities while it remained in FSA 2. Eventually though, group members decided that "Free Speech Area 1" ("FSA 1") to the east was the better protest site, as it had a clearer sightline to the Fox Theatre. Yet when they tried to move eastward across Woodward Avenue, Officer Ronald Lach and other members of DPD told them that they could either turn back to FSA 2 or be arrested. To reduce the potential for violence, DPD officers required that protestors for putatively "right-leaning" causes remain in FSA 2, while protestors for putatively "left-leaning" causes had to remain in FSA 1. A group member objected that officers were discriminating against Created Equal's speech because it "ha[d] a right to be over there." But the officers explained that, in fact, they were keeping the respective groups divided to maintain peace and safety. The group member again objected that the division was unconstitutional. Officer Lach responded "let it be unconstitutional then" and reiterated his "legal order" to turn back. After Harrington himself briefly argued with the officers, Created Equal returned to FSA 2.

As the evening wore on, Commander Szilagy, by then near Grand Circus Park, sensed that protesters in FSAs 1 and 2 were becoming increasingly agitated. One suggested to Szilagy that it might help defuse the tension if the groups were allowed to march in front of the Fox Theatre to express their messages. Once all the candidates and debate attendees were inside the theater—thus permitting Szilagy to redirect DPD manpower to monitoring the march—he agreed. First, the "left-leaning" groups from FSA 1 marched northward up Woodward Avenue, through the nominal restricted area. After the "left-leaning" groups were finished, the "right-leaning" groups marched as well. Defendants estimate that each side took about fifteen minutes, while Created Equal says it was only about five and that, in any event, the march was inadequate to properly express its message. The first day's events otherwise concluded without further issue.

Undeterred, Created Equal showed up to protest on the second day of the debates as well. Yet rather than heed officers' previous instruction to remain in FSA 2, Created Equal headed

straight for FSA 1 on the theory that it was the more desirable of the FSAs.  The group resided in FSA 1 for about forty minutes, apparently unnoticed, until one of its members began to use a bullhorn.  Officers then approached Created Equal and told its members that they could either move back to FSA 2 or be arrested.  Rather than face arrest, the group returned to FSA 2.  It now objects that bullhorns and even a rock concert were permitted in FSA 1 the day before, supporting an inference, in its view, that officers were discriminating against the group's message.  Fed up at last with these perceived slights, Created Equal left the debates "for good."

But the group was not yet finished contesting the restrictions.  A few months later, Harrington and Created Equal filed the present lawsuit under 42 U.S.C. § 1983.  Their complaint alleges violations of the First and Fourth Amendments and the Equal Protection Clause of the Fourteenth—we describe each specific allegation more fully below—and it names as defendants officers Szilagy, Worboys, and Lach, along with the City of Detroit.  *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694–95 (1978) (explaining that once a constitutional violation by an individual officer is established, the municipality itself may be held liable if its "official policy" was "the moving force of the constitutional violation").  As for the remedy, Created Equal seeks nominal damages for defendants' alleged past violations of its members' rights, a declaratory judgment that their rights were violated, and an injunction against future violations.

After discovery, plaintiffs and defendants cross-moved for summary judgment.  The district court adjudicated both motions in a combined opinion and order, denying Created Equal's motion and granting defendants'.  Reasoning that at no point were plaintiffs' rights violated, it declined to reach defendants' alternative arguments about qualified immunity and *Monell*.  Plaintiffs appealed the next day.

**II.**

Because the district court's grant of summary judgment to the defendants "put an end to [the] trial-level proceedings," it constitutes a "final decision[ ]" over which 28 U.S.C. § 1291 gives us jurisdiction.  *Trayling v. St. Joseph Cnty. Emps. Chapter of Local #2995*, 751 F.3d 425, 426 (6th Cir. 2014).  And we review that order *de novo*, undertaking the same inquiry as did the district court.  *See Jordan v. Howard*, 987 F.3d 537, 542 (6th Cir. 2021).  Thus, drawing all

reasonable inferences against the movant, we ask whether he has shown "that there is no genuine dispute as to any material fact" and that he "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A dispute is "genuine" only if a reasonable jury could decide it either way, and it is "material" only if its resolution could affect the case's outcome.  *Henson v. Nat'l Aeronautics & Space Admin.*, 14 F.3d 1143, 1148 (6th Cir. 1994); *Tenn. Dep't of Mental Health & Mental Retardation v. Paul B.*, 88 F.3d 1466, 1472 (6th Cir. 1996).  Last, we note that we apply these same standards even though the appeal arises on cross-motions for summary judgment.  *See Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991) (citation omitted); *accord B.F. Goodrich Co. v. U.S. Filter Corp.*, 245 F.3d 587, 592 (6th Cir. 2001).  Cross-motions, in other words, do not mean that the parties have agreed to a stipulated record and that one of the motions must be granted.  *Taft Broad. Co.*, 929 F.2d at 248; *B.F. Goodrich Co.*, 245 F.3d at 592. Rather, we evaluate the respective motions on their own merits, keeping in mind that a trial may be appropriate still. *Schickel v. Dilger*, 925 F.3d 858, 869 (6th Cir. 2019); *Taft Broad. Co.*, 929 F.2d at 248 (citation omitted).

## III.

We first address the remedies that Created Equal seeks and its Article III standing to seek them.  As we noted above, the group wants nominal damages, a declaratory judgment, and an injunction against future enforcement of the City's speech restrictions.  So it must show standing to seek *each* of those respective remedies.  *See, e.g.*, *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006).  But the group made only two-thirds of that requisite showing.  Created Equal no doubt may seek nominal damages to redress the asserted past violations of its constitutional rights.  *See Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 801–02 (2021).  And it can also seek a declaratory judgment that its rights were so violated, since the nominal-damages request supplies an independent jurisdictional basis to support a declaratory judgment.  *See Mich. Corr. Org. v. Mich. Dep't of Corr.*, 774 F.3d 895, 902 (6th Cir. 2014).

The problem is the request for injunctive relief.  As the Supreme Court has made clear, plaintiffs seeking the forward-looking remedy of an injunction must establish a likelihood that defendants will continue to violate their rights *in the future*.  *See City of Los Angeles v. Lyons*, 461 U.S. 95, 105–06 (1983).  Yet here, Created Equal has done nothing of the sort.  Its complaint

presented only three conclusory allegations about how Detroit may once again host some future political event, Created Equal may attend it, and thus the group may once again suffer a speech restriction. Even if those allegations were true, however, they would amount to mere someday-intentions. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 (1992). Moreover, we are at the summary-judgment stage, so plaintiffs "can no longer rest" on allegations alone; we instead must look to "specific facts" supported by evidence. *See id.* at 561 (citation omitted). In terms of Created Equal's *evidence* of its plans, Harrington's declaration says nothing about a future political event in Detroit that Created Equal seeks to attend. Nor could counsel for Created Equal salvage the injunctive-relief request at oral argument. As he frankly acknowledged, the group has "nothing specific" on any particular future event that it might attend in Detroit. *See* Recording of Oral Arg. at 2:44–3:06; *see also id.* at 2:21–2:26. So while plaintiffs' quest for retrospective relief suffices to keep this a live case or controversy, no jurisdiction exists under Article III to support an injunction.

**IV.**

We turn now to the various alleged constitutional violations plaintiffs seek to remedy. Harrington and Created Equal, best as we can tell, assert that defendants violated the Constitution at six discrete points—by imposing the restricted area that blocked access to traditional public fora, by ordering Created Equal to leave the St. John's Church's parking lot, by detaining Harrington when he refused to leave it, by creating and enforcing the division between FSAs 1 and 2, by permitting the brief march (with groups separated by viewpoint) through the restricted area, and by ejecting Created Equal from FSA 1 after a group member began to use a bullhorn. In Created Equal's view, defendants' behavior at each step violated either the Speech Clause of the First Amendment or the Equal Protection Clause of the Fourteenth, while Harrington's seizure in the church parking lot is additionally said to be a violation of the Fourth Amendment. We address each of those various theories below.

1.   Defendants' Creation and Enforcement of the Restricted Area

Created Equal first alleges that defendants transgressed the Speech and Equal Protection Clauses by preventing it from entering the "restricted area" around the Fox Theatre. The group

claims that this was a content- and viewpoint-based restriction applied against it because of its anti-abortion message and thus that officers' enforcement of the restricted area warrants strict scrutiny. Strict scrutiny would indeed be the appropriate standard if Created Equal had presented evidence that (1) officers' denial of entry was content based, or (2) officers used a facially content-neutral criterion against the group for the true purpose of suppressing its message. *See Reed v. Town of Gilbert*, 576 U.S. 155, 165–67 (2015).

Yet Created Equal has failed to show that strict scrutiny should apply because it has shown no genuine issue over whether defendants excluded the group from the restricted area based on the content of its speech. Both sides *agree* that the sole requirement for entry into the restricted area was possession of a ticket for the Democratic debate. *See* Szilagy Dep. at 18:21–23, R. 24-2; Harrington Dec. ¶21, R. 20-2. And they also agree that nobody from Created Equal held tickets to the event. Harrington himself confirmed as much in plaintiffs' own bodycam footage, which captured both his admission to officers on scene that the group had no tickets and the officers' consequent refusal to admit the group into the restricted area. *See* Szilagy Dep. at 33:23–34:2, R. 24-2. Indeed, as counsel for Created Equal conceded at oral argument, the group never even *tried* to secure the relevant tickets. Recording of Oral Arg. at 7:03–7:09.

There is also no genuine dispute that the group's lack of tickets was the true basis for officers' denial of its entry into the restricted area. In other words, there is no evidence that officers somehow used the group's lack of tickets as an ostensibly content-neutral pretext to deny its members entry when the real reason for the denial was the content of the group's message. *Cf. Reed*, 576 U.S. at 167 (citing *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). Each time the group sought to enter the restricted area, officers explained that entry required tickets—not that entry was forbidden given the content of the group's speech. *See, e.g.*, Video 1 at 0:45; Szilagy Dep. at 33:23–34:2, R. 24-2. Moreover, officers excluded *all* members of the public from the restricted area if they lacked the relevant credentials. *See* Szilagy Dep. at 127:10–129:15, R. 24-2. They thus turned away *all* uncredentialed protestors—from both "right-leaning" and "left-leaning" groups—no matter the content of their messages. *Id.* So there is no genuine dispute that defendants' enforcement of the "restricted area" was ideologically evenhanded.

Because officers' sole criterion for admission to or exclusion from the restricted area—whether an individual had a ticket—was content neutral, defendants' incidental burden on plaintiffs' speech merits only intermediate scrutiny. *See Ward*, 491 U.S. at 791. The governing case, therefore, is the Supreme Court's decision in *Ward v. Rock Against Racism*. *Id.* at 781. Under that precedent, a content-neutral time, place, or manner restriction can survive intermediate scrutiny if defendants make three showings. First, the restricted area must have served a "significant governmental interest." *Id.* at 791 (citing *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984)). Second, it must have been "narrowly tailored" to that purpose, meaning that the restriction survives so long as the governmental interest "would [have been] achieved less effectively" in its absence. *Id.* at 791, 799 (citing *Clark*, 468 U.S. at 293; *United States v. Albertini*, 472 U.S. 675, 689 (1985)). Last, it must have left open "ample alternative channels for communication of the information." *Id.* at 791 (citing *Clark*, 468 U.S. at 293). Defendants have met their burden as to each requirement.

First, defendants' asserted interest in establishing the restricted area was the maintenance of safety and security at the event. *See* Szilagy Dep. at 14:21–15:4, R. 24-2. Public safety and security against potential violence are no doubt significant governmental interests; indeed, this circuit has held that they are *compelling* state interests that can survive even strict scrutiny. *See Grider v. Abramson*, 180 F.3d 739, 749 (6th Cir. 1999) (recognizing that speech restrictions served the "compelling governmental interest in public safety and order"). Perhaps in light of that fact, Created Equal does not dispute that safety and security are significant (and, in fact, compelling) interests—at least in principle. It argues instead that defendants' *nominal* safety-and-security rationale was really a pretext to facilitate speech restrictions, given that defendants were aware of no "*specific*, security-based justification" for imposing the restricted area. Appellants' Br. at 17 (emphasis added); *see also id.* at 34. In other words, says Created Equal, because nobody called in advance to specifically threaten the event, DPD had no right to impose a restricted area around the Fox Theatre.

We disagree. Created Equal's argument fails to recognize that in today's age, virtually any large, high-profile event—particularly one with a collection of leading political figures—carries with it the risk for violence, whether or not law enforcement has some specific tip that the

event may be in danger from some specific individual. To hold that law enforcement could not establish a restricted area around such an event without a known, specific threat would make it essentially impossible to guard against terroristic violence, which is effective precisely because it is unpredictable. So it is not a legitimate inference that because DPD knew of no specific threat, no specific threat existed.

Moreover, Created Equal's attempt to draw such an inference distorts the present record. For instance, it notes several times that an FBI report on the debates remarked that "[a]s of 9 July 2019"—three weeks before the event—"we have no information to indicate a specific, credible threat to or associated with the 2019 Democratic Presidential Primary Debate." *See, e.g.*, Appellants' Br. at 17–18 (quoting Exhibit 2 at 60, R. 20-3). Yet the *next line* of that report explains that the FBI "remain[ed] concerned about the potential for criminal activity in close proximity to the event." Exhibit 2 at 60, R. 20-3. And that same report details multiple other potential security threats the debates faced. *See, e.g.*, *id.* ("We remain concerned about the sustained interest by international terrorists in targeting mass gatherings."). Likewise, several of the Democratic presidential candidates *had* received death threats in the months and weeks before the debates. *See, e.g.*, Article, R. 24-8 (death threat against Senator Cory Booker); USAO Press Release, R. 24-9 (death threat against Senator Bernie Sanders); Article, R. 24-10 (death threats against Senators Bernie Sanders and Kamala Harris). Commander Szilagy testified that he was aware of these "assorted threats" against the candidates, as well as of the "ongoing threat of terrorist activity," both of which were reasons for DPD's security measures. Szilagy Dep. at 87:8–12, R. 24-2. Ultimately, therefore, Created Equal has failed to establish a genuine dispute that defendants' asserted security rationale was somehow pretextual or non-existent.[3]

Second, defendants must show that the restricted area was "narrowly tailored" to achieving the event's safety and security. *Ward*, 491 U.S. at 791. Created Equal's argument here is much like before—it claims that the restricted area served no true security purpose

---

[3]Counsel for Created Equal conceded under questioning at oral argument that imposition of the restricted area was appropriate given these security concerns. Recording of Oral Arg. at 25:14–25:30. He shifted his objection merely to the *size* of the restricted area, contending that it was a few blocks too large and thus not narrowly tailored to the asserted security rationale. *Id.* at 25:30–27:45. But as we explain above, the restricted area's scope easily satisfies the tailoring standard set out in *Ward*.

because the sole criterion for admission was presentation of a ticket, rather than having to pass through security-screening measures like a metal detector. *See, e.g.*, Appellants' Br. at 32. True, in some contexts a regulation's under-inclusiveness may suggest that the state has only minimal interests in its enforcement. *See, e.g.*, *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 544–46 (1993). But here, in the context of intermediate scrutiny as applied to a content-neutral time, place, or manner restriction, we simply ask whether the state would have achieved its asserted interest "less effectively absent the regulation." *Ward*, 491 U.S. at 799.

Defendants have easily shown that the restricted area satisfies that standard. Without it, officers would have had *no* control over which or how many individuals were present in the immediate vicinity of the Fox Theatre. The restricted area ensured that only credentialed individuals were within the Fox Theatre's immediate vicinity, producing a smaller and more manageable crowd for law enforcement to superintend. Because defendants would have achieved that interest less effectively absent the restricted area, it satisfies the narrow-tailoring requirement.

Last, defendants must show that the restricted area left open "ample alternative channels of communication" for Created Equal to spread its message. *Ward*, 491 U.S. at 802. As this circuit has interpreted that test, the relevant question is "whether the proffered alternatives allow the speaker to reach its intended audience." *Contributor v. City of Brentwood*, 726 F.3d 861, 865 (6th Cir. 2013). Created Equal explains that its intended audience comprised the Democratic presidential candidates and members of the public who disagree with the group's message. As for the candidates themselves, however, Created Equal fails to explain why the First Amendment grants it an unrestricted right of access to high-profile political figures, particularly considering the aforementioned security concerns. Indeed, our sister circuits have rejected similar claims. *See, e.g.*, *Bl(a)ck Tea Soc'y v. City of Boston*, 378 F.3d 8, 14 (1st Cir. 2004) ("[A]lthough the opportunity to interact directly with the body of delegates by, say, moving among them and distributing literature, would doubtless have facilitated the demonstrators' ability to reach their intended audience, there is no constitutional requirement that demonstrators be granted that sort of particularized access."); *Marcavage v. City of New York*, 689 F.3d 98, 107 (2d Cir. 2012)

("The First Amendment does not guarantee protestors access to every or even the best channels or locations for their expression." (cleaned up)). So while Created Equal might have wished for all twenty candidates as an audience, it provides no persuasive account of why the Constitution entitled it to this perfect scenario—especially when *none* of the protest groups those nights enjoyed such "particularized access." *Bl(a)ck Tea Soc'y*, 378 F.3d at 14.

As for Created Equal's ability to converse with members of the public, the restricted area left in place copious alternative channels. Created Equal could have engaged in its protest virtually anywhere outside the restricted area, at least apart from FSA 1 itself. And the group in fact did engage in protest for much of the first day within FSA 2. *See, e.g.*, Video 3 at 0:00–0:30 (depicting the group's prominent location along Woodward Avenue). In similar circumstances, this circuit has held that such a "restricted area" leaves open ample alternative channels and thereby satisfies intermediate scrutiny. *See Grider*, 180 F.3d at 751 ("[T]he plaintiffs nevertheless had ample alternat[iv]e channels of public communication to proclaim their philosophical, political, or other agendas within the immediate geographical area of the two scheduled rally sites by carrying signs or banners, broadcasting on a street corner located outside but adjacent to the restricted area . . . and/or by arranging their own rally at a site outside the restricted area, all of which available options undercut the plaintiffs' argument that their speech had been unlawfully restricted."). Thus, because the restricted area satisfies intermediate scrutiny, we affirm the district court's grant of summary judgment to defendants on this particular First Amendment claim.

And we do likewise on the equal-protection claim. As this circuit has explained, a valid equal-protection claim requires showing "that the government treated the plaintiff 'disparately as compared to similarly situated persons and that such disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis.'" *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011) (citation omitted). Created Equal argues that the restricted area burdened its fundamental rights (to free speech) and that the group was treated disparately because other individuals within the restricted area were allowed to engage in political speech, while Created Equal was denied access altogether. Appellants' Br. at 39. Created Equal is correct that certain individuals were permitted to engage in political speech

within the restricted area; again, the supporters of Democratic presidential candidates were allowed to gather within a CNN-sponsored "candidate support corral."[4]  But this disparity was not an equal-protection violation, given that Created Equal was not "similarly situated" to those speakers within the candidate support corral.

To be "similarly situated" for purposes of an equal-protection claim, the plaintiff and the comparator must be alike "in all relevant respects." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992). Yet here, Created Equal and the speakers within the candidate support corral diverged in a dispositive way: the latter all had tickets to the Democratic debates, while Created Equal concededly lacked them.  That facially neutral criterion explains the distinction, and Created Equal presented no evidence that defendants purposefully employed it to produce the resulting disparate impact on speech.  *See Washington v. Davis*, 426 U.S. 229, 245–46 (1976) (holding that disparate impact without evidence of discriminatory intent does not violate the Equal Protection Clause); *see also Pers. Adm'r v. Feeney*, 442 U.S. 256, 279 (1979) ("'Discriminatory purpose,' however, implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." (footnote and citation omitted)); *Horner v. Ky. High Sch. Athletic Ass'n*, 43 F.3d 265, 276 (6th Cir. 1994) ("The Equal Protection Clause forbids only intentional discrimination.").  Because Created Equal was *not* similarly situated to those in the corral given its lack of tickets, and because there is no evidence this criterion was purposefully deployed to stifle the group's speech, its equal-protection claim must fail.

---

[4]Relevant to both equal protection and the First Amendment, the Comerica Park parking lot is itself private property, given that it is owned by the Ilitch family via Olympia Entertainment.  *See* Appellees' Br. at 5–6.  CNN's private choice to place a "candidate support corral" in a private parking lot was its prerogative as a private corporation, and because its behavior did not constitute state action, it had no First or Fourteenth Amendment obligation to establish a corresponding "candidate denigration corral."  *See, e.g.*, *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 619–20 (1991) (explaining that Fourteenth Amendment protections attach only if the relevant conduct constitutes state action) (citations omitted).

2. <u>Defendants' Order that Created Equal Leave the St. John's Church's Parking Lot</u>

Created Equal next asserts that defendants violated the group's rights under the Speech and Equal Protection Clauses by ordering it to leave the St. John's Church's parking lot. We will examine the former claim first. There is no genuine dispute that the church parking lot is private property. But that fact is problematic for Created Equal's First Amendment claim, because the First Amendment confers no general right for uninvited members of the public to speak on private property contrary to the proprietor's wishes. *See Lloyd Corp. v. Tanner*, 407 U.S. 551, 568 (1972) ("[T]his Court has never held that a trespasser or an uninvited guest may exercise general rights of free speech on property privately owned and used nondiscriminatorily for private purposes only."). Created Equal has also put forth no evidence that the church's parking lot has somehow historically functioned as a traditional public forum, *see Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 802 (1985), or otherwise stands in the shoes of the state, *see Marsh v. Alabama*, 326 U.S. 501, 507–09 (1946), such that it would be subject to the First Amendment. *Accord Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1930 (2019) ("[W]hen a private entity provides a forum for speech, the private entity is not ordinarily constrained by the First Amendment because the private entity is not a state actor."). To the contrary, defendants have shown that the parking lot was *not* a public forum—it was leased out for profit to CNN and an Olympia affiliate. As a matter of their contract and property rights, therefore, they were entitled to ask Created Equal to leave, and Created Equal had no "First Amendment easement" that would have permitted it to remain.

The equal-protection claim likewise falls short. It is true, of course, that CNN was permitted to remain in the parking lot while Created Equal was ordered to leave. But that disparity itself does not violate the Equal Protection Clause. Again, for purposes of equal-protection analysis, the plaintiff and the comparator must be "similarly situated," *Ctr. for Bio-Ethical Reform, Inc.*, 648 F.3d at 379, meaning that they must be alike "in all relevant respects." *Nordlinger*, 505 U.S. at 10. Unlike Created Equal, however, CNN had paid to use the parking lot. So, under the terms of that agreement, CNN was not trespassing. Created Equal likely was. *See infra* 17–18. Because CNN and Created Equal were not similarly situated, officers' ordering the group to leave did not represent unconstitutionally disparate enforcement of the trespass

laws.   Created Equal has also identified no other trespassers in the parking lot that police arbitrarily permitted to remain.[5]   So we reject this second equal-protection claim as well.

### 3.   Defendants' Placing Harrington in Handcuffs After His Initial Refusal to Leave the Church Parking Lot

Harrington individually claims that defendants violated his Fourth Amendment right against unreasonable seizures and his equal-protection rights when officers briefly placed him in flexcuffs after he refused to leave the church parking lot.   Yet the Fourth Amendment claim must fail because, at the moment officers began to place Harrington in cuffs, they reasonably believed he was committing criminal trespass under Michigan law and thus reasonably believed they had probable cause to arrest him.   *See District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018) ("A warrantless arrest is reasonable if the officer has probable cause to believe that the suspect committed a crime in the officer's presence." (citation omitted)).

Michigan's trespass law proscribes two relevant activities: (1) remaining without lawful authority on another's property after being told to leave by the owner, occupant, or an agent of the owner or occupant, or (2) entering or remaining without lawful authority on "fenced" property.   *See* MCL 750.552(1)(b)–(c).   The latter, "fenced" version of the crime clarifies that if the property is so fenced, "[a] request to leave the premises is not a necessary element for a violation of this subdivision."   *Id.* 750.552(c).   Thus, defendants say, Harrington likely was trespassing either because he chose to remain in the parking lot after being asked to leave by the occupants' agent (DPD acting on behalf of CNN) or he was trespassing because the parking lot had a fence.   Harrington counters that police may not serve as "agents" of the owner or occupant for trespass purposes—there being no formal principal-agent relationship between them—and so DPD could not have given him adequate notice to leave.   He also says that a

---

[5]The only way Created Equal tries to illustrate a disparity in this regard concerns an individual outside the candidate support corral who was holding a "Delaney for President" sign.   But this individual was *not* in the St. John's Church's parking lot; he was outside it on a sidewalk in the restricted area.   So he is not a direct comparator in this regard.   There is also no genuine dispute that officers ordered the individual back to the candidate support corral and did not allow him to freely protest within the restricted area.   *See* Harrington Dec. ¶30, R. 20-2. Commander Szilagy explained that officers later confronted the Delaney supporter about whether he had credentials and ordered him back to the corral.   *See* Szilagy Dep. at 83:6–84:12, R. 24-2.   Created Equal has not disputed Szilagy's representation that officers indeed confronted the man rather than allowing him to speak or protest unmolested.

property is not "fenced" under the statute unless it is *fully* enclosed by the fence, which the church parking lot was not.

We agree with defendants that Harrington was likely committing at least the first version of the trespass crime, given that he refused officers' repeated requests on behalf of the lessee to leave. True, no Michigan cases have clarified whether officers, as a technical matter of state law, may serve as "agents" of the owner or occupant for purposes of admonishing a trespasser. But out-of-state decisions construing similar statutes have endorsed that view. *See State v. Horn*, 377 N.W.2d 176, 182 (Wis. Ct. App. 1985), *aff'd*, 407 N.W.2d 854 (Wis. 1987) ("[A] police officer may serve as an agent of an owner or occupant to give notice of a trespass."); *People v. Thompson*, 372 N.E.2d 117, 121 (Ill. Ct. App. 1978); *People v. Wetherbe*, 462 N.E.2d 1, 4–5 (Ill. Ct. App. 1984). And, more importantly for Harrington's Fourth Amendment claim, the question is not whether he was technically guilty of a Michigan-law trespass. The Fourth Amendment does not prohibit seizures that happen to have some technical legal defect under state law; it prohibits only those seizures that are *unreasonable*. *See Virginia v. Moore*, 553 U.S. 164, 173 (2008) (explaining that a violation of state arrest law is not automatically a violation of the Fourth Amendment). So the real question is simply whether officers' belief that Harrington was committing trespass was *reasonable* under the circumstances, even if it happens to one day be proven technically mistaken. *See Heien v. North Carolina*, 574 U.S. 54, 60–62 (2014) (explaining that searches or seizures based on reasonable mistakes of either law or fact are not necessarily unconstitutional).

In our view, the officers' belief that Harrington was trespassing was at least reasonable. No Michigan precedents say officers may *not* admonish trespassers on behalf of the owner, and the case that officers may so admonish them is intuitive and straightforward: permitting an officer to confront a trespasser on behalf of an owner rather than forcing the owner to do it herself is conducive to safety and order. Thus, because officers at least reasonably believed that Harrington was committing trespass, they reasonably believed they had probable cause for the seizure. That reasonable belief satisfies the Fourth Amendment, so we affirm the district court's grant of summary judgment to defendants on the unreasonable-seizure claim.

For similar reasons, Harrington's equal-protection claim concerning the seizure fails as well. Harrington put forth no evidence that officers declined to detain other "similarly situated" individuals—other apparent trespassers—in the church parking lot. *Ctr. for Bio-Ethical Reform, Inc.*, 648 F.3d at 379. He only objects that officers did not likewise handcuff the media employees present there. But because they were invitees of the church under their lease rather than apparent trespassers like Harrington, they and Harrington are dissimilar in the "relevant respect[ ]" that while they had permission to be there, Harrington did not. *Nordlinger*, 505 U.S. at 10.

### 4. Defendants' Division of "Right-" and "Left-Leaning" Groups into FSAs 1 and 2 in Grand Circus Park

Created Equal's next contention is that defendants violated the group's First Amendment and equal-protection rights by creating and enforcing the division between FSAs 1 and 2, particularly because FSA 2 supposedly lacked a direct sightline to the Fox Theatre and was thus the inferior location. We note at the outset a dispute about how FSAs 1 and 2 were originally divided. Harrington asserts that it was by DPD's intentional design, while Commander Szilagy says the groups split voluntarily. *Compare* Szilagy Dep. at 26:11–28:2, R. 24–2, *with* Harrington Dec. ¶¶41–42, R. 20-2; Appellants' Br. at 36. Taking the view most favorable to Created Equal, we will assume the division arose by DPD's design. (There is no dispute, by contrast, that DPD at least *maintained* the ultimate division.) There is also some disagreement about whether FSA 2 was technically inferior to FSA 1. Created Equal claims that because FSA 2 lacked a direct sightline to the theater, media outlets like CNN did not feature the group's anti-abortion message in their programming. We will assume that FSA 2 lacked such a sightline.[6] So Created Equal's claim presents three issues: the level of First Amendment scrutiny that should apply, whether the division can withstand that level of scrutiny, and, assuming the division disparately affected the group, whether the disparity was intentional, such that it could represent an equal-protection violation.

As to the level of First Amendment scrutiny, the district court apparently believed that intermediate scrutiny was appropriate because the division between FSAs 1 and 2 was

---

[6]Neither dispute is material because neither affects the case's outcome. *See Paul B.*, 88 F.3d at 1472.

supposedly "content-neutral." Order at 21, R. 33. It explained that "police officers examined the content of each protest group's speech . . . to determine which side of the park they should stand on to best maintain safety and order." *Id.* And, citing a line from *Ward*, it then reasoned that the division was not content based—even though the content of protestors' messages determined to which FSA they were allocated—because it "serve[d] purposes unrelated to the content of the expression." *Id.* (citing *Ward*, 491 U.S. at 791). Thus, in the district court's view, because the division served the purpose of public safety, the division was content neutral, subject to, and satisfied intermediate scrutiny. *Id.* at 21–24.

The district court erred, however, when it concluded that because the division could be justified by some reason other than content, it was content neutral. The leading case on this point is *Reed v. Town of Gilbert*, which reversed the Ninth Circuit for having employed the same reasoning as did the district court. *See Reed*, 576 U.S. at 162–63. As the Supreme Court there explained, courts ask whether the restriction serves a purpose "unrelated to the content" of the expression only if the regulation is content neutral *on its face*. *Id.* at 165. When the regulation is facially content *based*, by contrast, whether it may also have some "content-neutral justification" is not relevant to determining the tier of scrutiny. *Id.* at 165–66. Instead, content-based regulations automatically receive strict scrutiny, at which point the government must show both a compelling state interest and that its regulation is the least-restrictive manner in which that interest could have been achieved. *Id.* at 163–64; *Bible Believers v. Wayne County*, 805 F.3d 228, 248 (6th Cir. 2015) (en banc) ("No state action that limits protected speech will survive strict scrutiny unless the restriction is narrowly tailored to be the least-restrictive means available to serve a compelling government interest.").

Here, the division of "left-leaning" and "right-leaning" groups into FSAs 1 and 2 was plainly content based. Indeed, it was viewpoint based. Officers had no way to determine whether they perceived groups as "left-leaning" or "right-leaning" until they examined and evaluated the content of the speakers' messages. For instance, based on Created Equal's signs, they decided that the group's message was "right-leaning," and thus that the group should not be allowed to traverse Woodward Avenue into FSA 1. So the division must withstand strict scrutiny. *See City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 142 S. Ct. 1464, 1471

(2022) (explaining that a regulation is facially content based when it targets speech for its "communicative content"); *see also Bible Believers*, 805 F.3d at 248 ("Both content- and viewpoint-based discrimination are subject to strict scrutiny." (citing *McCullen v. Coakley*, 573 U.S. 464, 478 (2014))).

Yet the district court's error does not alter the result. For the division of the groups also withstands even strict scrutiny. Defendants' asserted compelling interest was, again, public safety. *See* Szilagy Dep. at 95:7–13, R. 24-2. Permitting the groups to commingle could have produced an outbreak of violence, as had occurred at many similar rallies throughout the United States in the years and months leading up to the Democratic debates. (Indeed, several groups associated with such violence, like the Proud Boys and By Any Means Necessary, were present that day at Grand Circus Park. *See* Szilagy Dep. at 95:7–13, R. 24-2.) As this circuit has recognized, "any resultant imposition" on First Amendment rights from the "physical segregation" of such groups "[i]s trivial when juxtaposed against the compelling state interest in separating [ ] two mutually antagonist[ic] and potentially hostile congregations." *Grider*, 180 F.3d at 750. So defendants' asserted interest in "preserving community peace and safety" satisfies the first element of the strict-scrutiny analysis. *Id.* at 751.

And as this circuit has also recognized, "physical segregation" of potentially hostile groups can be the least-restrictive method of securing the state's interest in the prevention of potential violence. *See id.* at 750–51. Keeping the peace *without* physical segregation would have required a massive infusion of officers into Grand Circus Park. But there is no genuine dispute that such an infusion was impossible, given that officers were simultaneously busy maintaining event security at the Fox Theatre and elsewhere throughout the restricted area. *See* Szilagy Dep. at 133:13–134:2; 114:23–115:5, R. 24-2. Moreover, law enforcement declined to adopt harsher "peacekeeping techniques which might have been even more effective but concurrently more obstructive of robust public debate and intrusive upon individual rights, such as scheduling the rallies on different days or in different geographic areas, or physically searching every rally attendee." *Grider*, 180 F.3d at 749–50. Mere enforcement of the physical division, therefore, was the least-restrictive means of preventing violence. And so while the division was both content and viewpoint based, it satisfies strict scrutiny.

Created Equal's additional grievance about the alleged lack of a direct sightline to the Fox Theatre similarly presents neither a First Amendment nor an equal-protection violation. To be sure, defendants could not have intentionally put Created Equal into some inferior venue because of a disagreement with the content of its speech. *Reed*, 576 U.S. at 166. But when the burden is, as here, merely incidental, the First Amendment does not require that protestors and counter-protestors receive perfectly analogous pieces of real estate. *See, e.g.*, *Mastrovincenzo v. City of New York*, 435 F.3d 78, 101 (2d Cir. 2006) (explaining that a perfect-analogue requirement would be practically impossible to implement).

Instead, the group's real theory of harm appears to be that because of the sightline issue, CNN did not cover Created Equal's anti-abortion message. *See* Harrington Dec. ¶44, R. 20-2. Yet Created Equal has failed to explain why it did not simply protest in one of the other areas outside FSA 1 that had a direct sightline to the event. And it presented no evidence that CNN afforded such coverage to the "left-leaning" groups protesting in FSA 1. So Created Equal has not shown that the supposed lack of a direct sightline was the but-for or proximate cause of the alleged injury of CNN's non-coverage. *See Marvaso v. Sanchez*, 971 F.3d 599, 606 (6th Cir. 2020) ("Like a tort plaintiff, a § 1983 plaintiff must establish both causation in fact and proximate causation." (citations omitted)). The reality, of course, is that CNN was busy covering the Democratic debates—not protestors outside them. Its independent choice not to cover Created Equal's protest does not mean that said choice was somehow dictated by the City of Detroit. *See* Appellees' Br. at 28–30. As defendants point out, "[t]he fact that CNN apparently chose not to give Plaintiffs the prominent coverage they desired does not mean that the City's actions foreclosed this possibility." *Id.* at 29–30.

And the group has similar problems with its equal-protection theory. Again, it presented no evidence that defendants somehow *intentionally* gave the "left-leaning" groups the only direct sightline for the purpose of stifling plaintiffs' speech. Created Equal at best has shown disparate impact. But disparate impact alone does not suffice to state an equal-protection violation. *See Davis*, 426 U.S. at 246; *Feeney*, 442 U.S. at 279; *Horner*, 43 F.3d at 276. Because Created Equal presented no evidence that officers intentionally put the group in FSA 2

to deprive it of a direct sightline, its equal-protection claim about the alleged disparity between FSAs 1 and 2 must fail.

5.  The Brief March Through Woodward Avenue After the Debate Had Begun

At points, Created Equal seems to allege that defendants violated the First Amendment[7] during the brief march up Woodward Avenue after the debate had begun. *See, e.g.*, Appellants' Br. at 15–16. To the extent Created Equal asserts such a claim, it must fail. True, officers maintained the division between FSAs 1 and 2 during the march—a content- and viewpoint-based division. But as we explained above, the division satisfies strict scrutiny and thus does not constitute a First Amendment violation. *See supra* 20–21.

Created Equal's ultimate point in discussing the march seems less to illustrate some independent constitutional violation and more so to argue that permitting a march through the restricted area without subjecting the marchers to a security screening undermined the restricted area's nominal security justification. But again, the record belies that claim. Commander Szilagy explained that officers permitted the march (1) to defuse brewing tensions between FSAs 1 and 2, and (2) only after all the debate participants and spectators were inside the Fox Theatre, which allowed DPD to redirect its law-enforcement presence to monitoring the marchers within the restricted area. *See* Szilagy Dep. at 133:13–134:2, 114:23–115:5 R. 24-2. Created Equal presented no evidence to contest those points. So there is no genuine dispute that the rationales for the march aligned with the rationales for the restricted area—the maintenance of public safety.

6.  The Bullhorn Incident and Created Equal's Ejection from FSA 1

Created Equal last asserts that defendants violated the Speech or Equal Protection Clauses by ordering the group to leave FSA 1 on the second day of the protests after one of its members began to use a bullhorn, despite bullhorns' use (and even a rock concert) having

---

[7]By contrast, Created Equal made no apparent attempt in its opening brief to argue that either the division of the marchers into "left-leaning" and "right-leaning" groups or the order in which the groups marched constituted an equal-protection violation. We thus decline to analyze such a claim. *See Island Creek Coal Co. v. Wilkerson*, 910 F.3d 254, 256 (6th Cir. 2018).

occurred in FSA 1 the day before. Framed as a First Amendment challenge, this claim is somewhat odd. There is no First Amendment right to amplified sound *per se*, *see Kovacs v. Cooper*, 336 U.S. 77, 87–88 (1949), so strict scrutiny would be relevant only if the state's regulation of amplified sound were a proxy regulation against speech, on the theory that the nominal regulation of sound levels was actually a covert method of content regulation. *Ward*, 491 U.S. at 794. Created Equal's real point thus seems to be that defendants selectively enforced an ersatz bullhorn restriction because, in fact, they did not want the group's message in FSA 1.

Yet we need not make all these inferential leaps to conclude that strict scrutiny applies. Defendants admitted that they were *overtly* drawing a content- and viewpoint-based distinction by separating "right-" and "left-leaning" protestors into the respective FSAs. *See supra* 19. The bullhorn incident was simply a specific application of that division. As we have already explained, however, splitting the groups as the officers did readily satisfies strict scrutiny.

Nor did the bullhorn incident offend the Equal Protection Clause. Again, Created Equal must show that it was treated "disparately as compared to similarly situated persons and that such disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis." *Ctr. for Bio-Ethical Reform, Inc.*, 648 F.3d at 379 (citation omitted). Two problems with that showing arise. Even if Created Equal and the "left-leaning" groups in FSA 1 were similarly situated, and even assuming Created Equal's speech rights were burdened, the destination would simply be a strict-scrutiny analysis. *See Mich. State A. Philip Randolph Inst. v. Johnson*, 833 F.3d 656, 662 (6th Cir. 2016). And separation of the groups satisfied strict scrutiny because it helped defuse potential violence. *See supra* 20–21. Even more fundamentally, though, Created Equal and the various "left-leaning" groups were not "similarly situated" as to their bullhorn use in FSA 1. They might have been similarly situated if officers were merely enforcing a noise ordinance, in which case only the *volume* of each group's speech, rather than its content, would matter. But officers were not enforcing a noise ordinance; they were enforcing a policy of separating speakers by the content of their speech to prevent potential violence. And Created Equal's speech might have caused a confrontation in FSA 1 in a way that "left-leaning" speech would not have. Thus, Created Equal and the "left-

leaning" groups with bullhorns on Day 1 (or, for that matter, the performers at the rock concert) were not similarly situated for purposes of equal protection.

**V.**

Because no constitutional violation occurred here, we reach neither the individual defendants' alternative arguments about qualified immunity nor the City of Detroit's concerning *Monell*.  And for the same reason, we affirm.